UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DEVIN JOHNSON,

              Plaintiff,          **RULE 56 STATEMENT**

v.

                          **Civil Action No.: 21-cv-6683 (DGL/MWP)**

The CITY OF ROCHESTER and ROCHESTER
POLICE OFFICER JONATHAN LAUREANO,

              Defendants.

---

The Defendants, the City of Rochester and Rochester Police Officer Jonathan Laureano, by and through their undersigned counsel, and as and for their Rule 56 Statement in support of their motion for summary judgment, submit that there are no genuine issues of fact to be tried with regard to the following material facts:

1. The incident at issue in this action occurred at approximately 9:45 on the evening of Saturday, August 24, 2019, in the vicinity of 73 Miller Street and on an adjacent street, Wright Terrace, in the City of Rochester (Declarations of Jonathan Laureano and of Police Officers Phillip Perelli and William Wagner, and Exhibits attached to each).

2. Approximately 9:00 that evening, Plaintiff, Devin S. Johnson, was observed by Rochester Police Officers, Phillip Perelli, William Wagner, Thomas Lisle and Jose Rodriguez, who were on duty, in full uniform and were riding together in a marked, Rochester Police Department (RPD) SUV, at 5 Lincoln Street in the City of Rochester where Johnson stopped in a black Audi Q7 SUV (Perelli and Wagner Declaration and Exhibits).

3. The two-story home at 5 Lincoln Street was a known gang location and was associated with drug sales, which is why the four Officers passed by. When Johnson saw the marked SUV, he began behaving suspiciously, exiting the Audi, with the engine running and the radio blaring, and he appeared to attempt to disassociate himself with the vehicle (Perelli and Wagner Declaration and Exhibits).

4. The marked SUV, operated by Officer Rodriguez, left the area and made a loop down Bay Street and Clifford Avenue and the Officers attempted to reacquire sight of Johnson (Perelli Declaration).

5. The Officers in the SUV radioed for assistance in locating Johnson's vehicle, asking the Clinton Section's patrol officers for help and asking Sgt. Jeremy Robinson, who had access to the Blue Light Cameras (BLCs) in the area, for his help, as well (Perelli and Wagner Declarations).

6. The Officers radioed Sgt. Robinson that they observed the Audi Johnson was operating at a gas station located on the northeast corner of Clifford and Portland Avenues, where he was getting gas (Perelli Declaration; and Exhibit A—BLC footage from camera located on the light pole at the northeast corner of Portland and Clifford).

7. The BLC footage from that corner shows the SUV turning right from Clifford Avenue, westbound, onto Portland Avenue, northbound, at 9:31 p.m. When Officer Rodriguez drove past the gas station, Mr. Johnson saw the SUV and he again immediately disassociated himself with the Audi and kept watching the SUV to where Officer Rodriguez parked about a block away (Perelli and Wagner Declarations; and Exhibit A).

8.     The Officers in the SUV were aware that Johnson was watching them and Officer Rodriguez pulled the SUV back out of sight and stopped and Officer Perelli requested that a Clinton Section Officer pass by the gas station to determine whether Mr. Johnson was still there (Perelli and Wagner Declarations; and Laureano Declaration and Exhibits). He also asked Sgt. Robinson to keep watch on him on the BLC (Id.).

9.     Officer Laureano responded to that request and passed the gas station on Portland, southbound, a few minutes after the SUV passed—at 9:36 p.m. (Perelli, Wagner and Laureano Declarations and Exhibits; and Exhibit A).

10.    Approximately 10 minutes later, Mr. Johnson, who had been talking to someone in a silver Honda Civic in the parking lot at the gas station, walked to the Audi and followed the Civic out of the parking lot, turning left/eastbound onto Clifford Avenue and cutting off a westbound vehicle as he did so (Exhibit A—9:44:44 to 9:44:56).

11.    Sgt. Robinson advised that the Audi was leaving the gas station and Officer Laureano followed him eastbound on Clifford Avenue, separated from the Audi by one vehicle (Laureano Declaration; and Exhibit A—9:45:16 to 9:45:20).

12.    Sgt. Robinson trained the BLC to keep the vehicles in sight as they made their way eastbound toward Miller Street, then switched to the BLC located at the intersection of Clifford and Miller on the north side of Clifford across from the intersection, and picked up the vehicles there as they reached the intersection (Exhibit A 9:44:44 to 9:45:29; and Exhibit B—BLC footage from Miller/Clifford intersection 9:45:22 to 9:45:29).

13.    The Miller/Clifford BLC footage shows Mr. Johnson turning right onto Miller Street in the Audi at 9:45:22 to proceed southbound, followed by the vehicle

3

between his and Officer Laureano's, which passed the intersection eastbound a couple seconds after Johnson turned, followed by Officer Laureano's marked car, which turned right onto Miller a few of seconds after Johnson turned (Exhibit B—9:45:29).

14.  As soon as the front end of Officer Laureano's car turned onto Miller, Mr. Johnson activated his brake lights (at 9:45:30.420) [Exhibit B] and his brake lights went on again and stayed on as Officer Laureano's vehicle straightened out southbound and followed him (at 9:45:31.820 (Exhibit B).

15.  Johnson stayed on his brakes and slowed as Officer Laureano's car closed on him and he came off of and on his brakes again as Officer Laureano got closer, in response to which Officer Laureano stepped on and off his brakes (Exhibit B—9:45:36.757 to 9:45:40.020).

16.  As the vehicles slowed, the BLC's view of the Audi was obscured momentarily by a utility pole (from 9:45:35:357 to 9:45:40.020), after which the Audi appeared to be drifting right—toward the west curb (Exhibit B).

17.  Miller Street south of the intersection with Clifford is one-way southbound and a few cars were parked along the west curb (on the right side) as the Audi and Officer Laureano's car moved south (Exhibit B).  Google Maps Street photos from 2007 to September 2022 show that motorists regularly parked along the right/west curb and the left side was the travel lane (Exhibit C).

18.  Officer Laureano's intent, if he had probable cause to do so, was to stop the Audi and identify the driver (Laureano Declaration and Exhibits).

19.  Subsequent to the traffic stop and his arrest, Mr. Johnson was placed in the backseat of Officer Brandon Glodowski's marked car for transport to the RPD

Clinton Section office for questioning and he made voluntary, unsolicited, extemporaneous statements to Officer Glodowski about what had occurred and why he was on Miller Street, as captured on footage from Officer Glodowski's body worn camera (BWC) (Exhibits D through H)[1]. Mr. Johnson explained that he had received a text from a friend who lived in an apartment in the same building as Mr. Johnson, who texted him while he was at the gas station, to request a ride home, advising that he was walking somewhere on Miller Street (Exhibit E—22:31:17 to 21:31:26; and Exhibit I—General Municipal Law §50-h hearing transcript, pp. 13-14). He said that he was looking for his friend and was "pulling to the side" as he noticed that there was a car behind him, which he said he was not then aware was a police car (Exhibit E—22:31:10 to 22:31:15).

20. Officer Laureano observed the Audi drifting to the right toward the curb line the driver and had not activated his directional signal to indicate the lane change, and Officer Laureano then activated his emergency lights and effected a traffic stop (Laureano Declaration and Exhibits; and Exhibit B—9:45:40.153 to 9:45:42.953).

21. As the Audi came to a stop along the west curb in front of 73 Miller Street, Mr. Johnson immediately got out and began running southeast across Miller Street toward Wright Terrace, the next intersecting street south on Miller, just as Officer Laureano was putting his car in park and before he could get out (Laureano Declaration).

---

[1] Officer Glodowski's BWC footage is captured in five clips: the first (Exhibit D) is from 21:48:29 to 21:32:27; the second (Exhibit E) is from 21:56:06 to 21:58:40; the third (Exhibit F) is from 22:05::38 to 21:13:43; the fourth (Exhibit G) is from 22:27:55 to 22:36:00; and the fifth (Exhibit H) is from 22:42:52 to 22:54:39).

22. In or about early February 2018, Mr. Johnson was released from prison to parole supervision after having served 5 years of a 6 year sentence for second degree criminal possession of a weapon, armed robbery and grand theft, and was still on parole on the evening of August 24, 2019 (Exhibit J—NYS DOCC documents).

23. In fact, as Mr. Johnson explained to Officer Glodowski during transport to the Clinton Section office, his primary concern that evening was not being caught out after his 8:00 p.m. parole curfew and potentially having his parole revoked (Exhibit G—22:30:14 to 22:31:09. He had previously asked Officer Glodowski about the possibility of speaking to a supervisor while they were still at the location where he was arrested and as Mr. Johnson waited for medical attention for a cut on his foot, toward the end of attempting to "work out a deal" to avoid being booked and potentially having his parole revoked (Exhibit F—22:06:51 to 22:09:35). He expressed the same desire as he and Officer Glodowski neared the Clinton Section Office and when he was placed in an interview room there (Exhibit G—22:32:10-40, and 22:43:41-43). He also expressed regret about getting out of his car and running as soon as it stopped, rather than staying with the car, as believed that in retrospect, the Officers might have been more reasonable with him about working out a deal had he stayed in it (Exhibit G—22:29:25).

24. Just after Officer Laureano parked and got out of his vehicle and began chasing Mr. Johnson, the SUV with the four other Officers pulled in behind his car and Officers Perelli and Lisle got out and joined the foot pursuit (Laureano, Wagner and Perelli Declarations; and Exhibit B—9:45:54). The chase took them between the houses at 66 and 64 Miller and through some yards behind the houses on the north side of Wright Terrace, which had high wooden fences, Officer Laureano momentarily lost

sight of Mr. Johnson, Officer Lisle broke off the chase because he could not track where they went and Officer Perelli continued foot pursuit (Laureano and Perelli Declarations; and Exhibits K and L—Officer Perelli's and Officer Lisle's BWC footage, respectively).

25. Mr. Johnson later explained to Officer Glodowski that he was tired and out of shape and was not able to outrun the pursuit (Exhibit F—22:11:42 to 22:12:20). Officer Laureano caught up with him in front of 13 Wright Terrace and brought him to the ground in the grassy area between the sidewalk and the curb (Laureano and Perelli Declarations; and Exhibit K—Officer Perelli's BWC footage).

26. Officer Laureano lost his BWC at some point during the pursuit, which took him and Mr. Johnson through dense vegetation and fencing, but Officer Perelli's BWC shows Officer Laureano just after he caught Mr. Johnson (Exhibit K). That footage shows Officer Perelli lending assistance and affixing his own handcuffs to Mr. Johnson's wrists, so Officer Perelli was only slightly behind them in the foot pursuit (Laureano and Perelli Declarations; and Exhibit K). That footage shows that Officer Laureano made the apprehension alone (Id.).

27. Officer Rodriguez's BWC footage shows him driving the SUV to Wright Terrace near to where Officer Laureano and Mr. Johnson were (Exhibit M). After he and Officer Laureano brought Mr. Johnson to his feet, Officer Perelli backtracked to determine whether Mr. Johnson had discarded anything during the chase and Mr. Johnson was handed off to Officer Glodowski (Laureano and Perelli Declarations; and Exhibits F—21:48:58 to 21:50:21; K; and M).

28. As Mr. Johnson exited the Audi and began running, he ran out of his sneakers, which are seen on Officer Lisle's BWC footage in the road in his path of flight

7

toward Wright Terrace—he explained to Officer Glodowski that he did not make it a practice of tying them, which is why they came off (Exhibit F—22:16:06 to 22:16:15; and Exhibit L). He sustained a cut on the bottom of his right foot and both of his socks were ripped as the result of running across pavement and other rough terrain, and Sgt. Robinson summoned an ambulance to treat him (Exhibit D—21:51:22 to 21:52:02 Exhibit N—Sgt. Robinson's BLC footage 21:51:22 to 21:51:57). Mr. Johnson mentioned to the EMT who treated his foot that he felt a pain on his left cheek, which the EMT looked at determined that it was a superficial scratch, which was probably from running through the thick vegetation (Exhibit F—22:10:20 to 22:10:35). Officer Glowoski's BWC footage at the scene, during the transport to the Clinton Section Office and while Mr. Johnson was there, as well as the footage from his transport by Officer Glowoski to the Public Safety Building, all show that he was uninjured, except for the cut on his foot (Exhibits D through H).

29. While riding in Officer Grodowski's car during transport to the Clinton Section Office, Mr. Johnson made the following statements and admissions, voluntarily and without prompting, to explain why he did what he did, where he was going, and what he was doing in the moments before he was pulled over, all of which support Officer Laureano's perspective of what occurred and are dispositive of his action:

- Officer Glodowski's clip 4 opens with he and Mr. Johnson in his car and leaving Wright Terrace and Mr. Johnson asks him to be honest about the chance of working out a deal to be released without being booked—whether Officer Glodowski had ever seen them be reasonable and let somebody go (Ex. G—22:28:12 to 22:29:00);

- Mr. Johnson again explained why he immediately fled—"that's why I hauled ass and my shoes came off and I fell. But my ass got tired. I should have just staying in the [f'g] car" (Ex. G—22::29:11 to 22:29:40);

- Mr. Johnson explained that he ran because he was on parole—"you pulled me over and I'm not supposed to be outside. I'd rather take a chance and run and still be able to … you know what I'm saying. If you were put in this situation, you'd …" (Exhibit G—22:30:27 to 22:30:38);

- Mr. Johnson added that, "that's why I'm not wilding at the car, I'm just like, damn! But I think about it, had I just stayed in the [f'g] car, they'd probably be more reasonable. That's why I'm like, dude, why are you running, yo? Because I'm not supposed to be outside, of course I'm going to run. I'm going to be out almost two years now. I should have took my ass in the house, though. That's where I was about to go" (Exhibit G—22:30:48 to 22:31:09).

- He then explained why he didn't go straight home, why he was on Miller Street and what happed there—"I just seen the car behind me and I thought, [WTF]?! I didn't even know it was the Police. I was just pulling to the side—I was supposed to—I was … he was coming over to the area. I was about to drop him off before I went in the house. He said he was walking down Miller. That's when I turned. I look and the lights go on. I'm like, [WTF}?!" (Exhibit G—22:31:10 to 22:31:25). (He was referring to his neighbor, who texted him to ask for a ride home, and was conveying a chronology of what occurred—he was "pulling to the side" before he knew that the car travelling behind him was a Police car, which he did not know until the emergency lights were activated. This is consonant with what Officer Laureano saw (Laureano Declaration)).

9

30. Mr. Johnson's extemporaneous, voluntary statements also contradict the allegation in paragraphs 20, 55 and 63 of his Amended Complaint that Officer Laureano ordered him out of his car at gunpoint, seized him and arrested him, also at gunpoint. As Officers Laureano and Wagner attest, and as Mr. Johnson stated, he was out of his car and running ("hauling ass," as he characterized it) as soon as he stopped his car. He was not "ordered out" and not at gunpoint. Officer Laureano never had the opportunity to draw his sidearm. He was chasing Mr. Johnson from the time he stopped his own car and got out.

31. Further, as Officer Wagner attests, it would have been contrary to RPD policy to order anyone out of a vehicle during a traffic stop where it is unknown how many occupants are in the vehicle and whether they are armed (Wagner Declaration). The policy dictates that the Officer effecting the stop use emergency lights to keep any occupants in the vehicle and, if necessary, to use the PA system in their car to verbally order them to remain there until back-up Officers arrive (Id.).

32. Just after Mr. Johnson's apprehension, Officer Lisle conducted an inventory search of the Audi, which was to be towed (Exhibit O—Lisle testimony at Mapp Hearing, pp. 27-30). A loaded handgun was located under the front passenger seat, which was reported as stolen in 2015 (Id., pp. 35-36).

33. Mr. Johnson was booked at the Monroe County Jail at the Public Safety Building and was held on a Division of Parole Warrant because of the violations of various conditions of his parole (Exhibit P—various documents).

34. Various charges were brought against Mr. Johnson, including for second degree criminal possession of a weapon and for possession of a stolen weapon (Exhibit

P). Mr. Johnson was indicted by a grand jury and subsequently, a Mapp Hearing was held by Monroe County Supreme Court Justice, Charles A. Schiano, Jr., on the issue of whether there was probable cause for the traffic stop and Mr. Johnson's arrest [Exhibit Q—Decision and Order). Justice Schiano saw the BLC footage of the stop on Miller Street and in his view, it appeared that Officer Laureano activated his emergency lights before Mr. Johnson had pulled the Audi to the curb to stop and he thus determined that there was not probable cause for the stop (Id.). As is more fully explained in the Defendants' Memorandum of Law submitted herewith, his Decision has no preclusive effect and is of no moment to the determination of this motion.

35.   On October 11, 2021, Mr. Johnson commenced this suit with the filing of a Summons and Complaint with the Monroe County Clerk (Index No. E2021-009225) and because he included causes of action under 42 U.S.C. §1983, the Defendants removed this action to this Court (Dkt #1). The Defendants served their Answer and Mr. Johnson's counsel subsequently filed an Amended Complaint in response to the removal (Dkt #15).

36.   The Amended Complaint contains 10 Causes of Action, the first seven of which are State law claims for: false arrest and false imprisonment; malicious prosecution; assault and battery; injurious falsehood; negligent screening, hiring, and retention; negligent training, retraining and supervision; and a State Constitutional due process claim (Id.). The other three are for: malicious prosecution; denial of a fair hearing and due process; and failure to intercede, all under 42 U.S.C. §1983 (Id.). Based on the foregoing undisputed facts, which include Mr. Johnson's own admissions, and for the reasons more fully set forth in the accompanying Memorandum, none of

those claims or causes of action are meritorious and the City and Officer Laureano and entitled to summary judgment, pursuant to FRCP Rule 56, and Officer Laureano is also entitled to qualified immunity and to dismissal of this suit.

DATED: June 30, 2023
Rochester, New York

Yours, etc.,

LINDA S. KINGSLEY, Corporation Counsel

BY: _____
CHRISTOPHER S. NOONE, Esq., of Counsel
Attorneys for Defendants
30 Church Street, Room 400A City Hall
Rochester, New York 14614
Telephone: (585) 428-6753
chris.noone@cityofrochester.gov