# EXHIBIT O

Case 6:21-cv-06683-EAW-CDH   Document 29-12   Filed 07/06/23   Page 2 of 8

```
                                                                27
     THOMAS LISLE - DIRECT
 1                    T H O M A S   L I S L E,
 2   called herein as a witness, first being duly sworn, testified
 3   as follows:
 4              COURT DEPUTY:  Please state your name and spell
 5        it for the record.
 6              THE WITNESS:  It's Police Officer Thomas Lisle.
 7        T-H-O-M-A-S, first name.  L-I-S-L-E, last name.
 8              THE COURT:  You may ask.
 9   DIRECT EXAMINATION BY MR. CLARK:
10        Q     Good morning, Officer.
11        A     Good morning.
12        Q     Where do you work, Officer?
13        A     With the City of Rochester Police Department.
14        Q     In what capacity?
15        A     As a police officer.
16        Q     How long have you worked as a police officer?
17        A     For ten years.
18        Q     Now, Officer, I want to direct your attention to on
19   or about August 24th, 2019, around 9:46 p.m.  Did you respond
20   to assist some fellow officers in regards to a traffic stop?
21        A     Yes.
22        Q     Where did you go?
23        A     73 Miller Street.
24        Q     And is that location in the city of Rochester,
25   Monroe County, New York State?
```

THOMAS LISLE - DIRECT

1   A   Yes.
2   Q   What information did you receive from your fellow
3 officers that led you to that location?
4   A   Officers made a traffic stop and the driver was
5 running from the vehicle.
6   Q   So what did you first observe when you got to 73
7 Miller Street?
8   A   Male running down the middle of the road, and
9 Officer Laureano chasing him.
10  Q   About how far away from you were this male and
11 Officer Laureano when you first arrived?
12  A   Probably when we first pulled up to the stop, maybe
13 25, 50 feet.
14  Q   What did you do when you made those observations?
15  A   I got out, once my vehicle stops, and run eastbound.
16  Q   So were you assisting, then, in the foot pursuit?
17  A   Yes.
18  Q   What, if anything, happened in regards to your
19 assistance in the foot pursuit?
20  A   When I got to the edge of the yard I was in, it
21 appeared that I couldn't see the driver anymore.  I came back
22 out to Miller Street.
23  Q   And what did you do after you lost sight of the
24 driver then?
25  A   I came back out to the car that he fled from.

```
                                                             29
     THOMAS LISLE - DIRECT
 1        Q    So you returned back to the vehicle?
 2        A    Yes.
 3        Q    Do you recall what kind of vehicle that was?
 4        A    It was a black Audi Q7.
 5        Q    This is an SUV or sedan or something else?
 6        A    It's an SUV.
 7        Q    And did there come a time you learned that the
 8   driver of the vehicle had been taken into custody by your
 9   fellow officers?
10        A    Yes, I heard over the radio.
11        Q    So after you learned that the driver had been taken
12   into custody, did there come a time when yourself and your,
13   some fellow officers conducted an inventory search of the car?
14        A    Yes.
15        Q    What were you doing the inventory search for?
16        A    For safekeeping.
17        Q    What do you mean?
18        A    Well, at that point the driver was being arrested,
19   the vehicle had a window down and was in the roadway.
20        Q    Now, you said the window was down, correct?
21        A    Yes.
22        Q    Which window?
23        A    The driver's window.
24        Q    Do you know where the keys were to the vehicle?
25        A    No.  There was a, one key fob was in the glove box.
```

```
                                                           30
     THOMAS LISLE - DIRECT
 1       Q    All right.  And that location, Miller Street there,
 2   is that a high crime area?
 3       A    Yes.
 4       Q    Could you go into a little more detail about that?
 5       A    Respond to that area for multiple reports of
 6   shootings and drug dealing at the corner, there and the corner
 7   of Clifford and Miller.
 8       Q    So were you concerned about the vehicle being left
 9   there with the window open --
10            MR. YOUNG:  Objection.
11            THE COURT:  Let him finish.
12            MR. YOUNG:  Leading question.
13            THE COURT:  Overruled.  You can ask that
14       question.
15       Q    Due to the nature of the area, as well as the fact
16   that the window was open, the key fob was in the vehicle, did
17   you have any concerns about leaving it there?
18       A    Yes.
19       Q    What were your concerns?
20       A    Concerned that someone would be able to get in the
21   car and steal anything from the car, or take the car itself.
22       Q    Did you then conduct an inventory search of the
23   vehicle?
24       A    Yes.
25       Q    And does the Rochester Police Department have rules
```

35
THOMAS LISLE - DIRECT

1  Q    And was that document prepared in connection with
2  this case?
3  A    Yes.
4  Q    And is that also required to be filled out pursuant
5  to People's Exhibit 1, the general order?
6  A    Yes.
7  Q    Does that exhibit appear to be in substantially the
8  same condition as when you last saw it?
9  A    Yes, it does.
10 Q    Is it a fair and accurate copy of the original?
11 A    Yes.
12 Q    And does there appear to be any additions, deletions
13 or changes to that document?
14 A    No.
15          MR. CLARK:  People move Exhibit 4 into
16     evidence.
17          THE COURT:  Mr. Young?
18          MR. YOUNG:  No objection.
19          THE COURT:  Mark it received.
20 (People's Exhibit 4 received in evidence.)
21 Q    And then, just once again, Officer, you indicated at
22 some point you did locate a firearm in the vehicle?
23 A    Yes.
24 Q    Where was the gun?
25 A    It was underneath the front passenger seat, in a

THOMAS LISLE - DIRECT

1  drawer that goes underneath the seat.
2       Q    And was it wrapped in anything?
3       A    There was a washcloth over top of it.
4       Q    Did you observe if the firearm was loaded?
5       A    Yes, when the technician unloaded it.
6       Q    Then after you found the gun, did you move it or
7  manipulate it in any fashion?
8       A    No.
9       Q    Was there a technician called to come and collect
10 the firearm?
11      A    Yes.
12      Q    And did anyone move or interfere with the firearm
13 until it was collected by the technician?
14      A    No.
15           MR. CLARK:  I have no further questions for
16 Officer Lisle.  Thank you.
17           THE COURT:  Thank you.
18           Mr. Young, cross?
19 CROSS-EXAMINATION BY MR. YOUNG:
20      Q    Good morning, Officer Lisle.
21      A    Good morning.
22      Q    Couple follow-up questions.  Now, you took no part
23 in the stop of this vehicle, correct?
24      A    No.
25      Q    And at some point in time you started chasing and