UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DEVIN JOHNSON,

                Plaintiff,

   -v-

The CITY OF ROCHESTER and ROCHESTER
POLICE OFFICER JONATHAN LAUREANO,

                Defendants.

**DEFENDANTS' MEMORANDUM
OF LAW IN SUPPORT OF RULE
56 SUMMARY JUDGMENT MOTION**

**Civil No. 21-CV-6683 (DGL/MWP)**

---

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted in support of the Defendants' motion for summary judgment of this action, pursuant to FRCP Rule 56, and for summary judgment based upon qualified immunity for the individual Defendant, Police Officer, Jonathan Laureano.

## STATEMENT OF FACTS

Factual and documentary support for the material, undisputed facts recounted herein are contained in and attached to the Defendants' Rule 56 Statement, and the Declarations of Defendant, Laureano, and his fellow Police Officers, Phillip Perelli and William Wagner, and this Court is respectfully referred there. Those facts are as follows.

On the evening of Saturday, August 24, 2019, at approximately 9:00 p.m., Officer Perelli and his three fellow Officers, William Wagner, Jose Rodriguez, and Thomas Lisle, were on duty, in full uniform, and were operating a marked Rochester Police Department (RPD) SUV. They were assigned to the Tactical Unit and were on a routine

patrol in the northeast area of the City of Rochester. As they travelled on Lincoln Street, they observed a black male, who they later learned was the Plaintiff, Devin Johnson, stopping a black, Audi Q7 SUV in front of 5 Lincoln Street, which was known to RPD and the Officers as a gang hangout and drug house and was one of the locations they were surveilling that evening.

Immediately upon observing the marked SUV, Mr. Johnson disassociated himself from the Audi, leaving it running with the radio blaring. Mr. Johnson appeared to the Officers to be exquisitely uncomfortable upon viewing them and they circled around the area they were patrolling to resume their observation.

The SUV made its way westbound on Clifford Avenue and as the Officers turned right onto Portland Avenue at that intersection, heading northbound, they observed the Audi and Mr. Johnson at the gas station located on the northeast corner. Again, immediately upon observing the marked SUV, Mr. Johnson disassociated himself from the vehicle, which the Officers again found highly suspicious. He kept them under observation and they kept him under observation as the SUV moved and stopped a couple of blocks northbound.

The Officers radioed a general request to the Clinton Section road patrol Officers to drive past the gas station to determine whether the Audi was still there. They also radioed Sgt. Robinson, who was at the Clinton Section Office and had access to the Blue Light Cameras (BLCs) in the area to advise that they had observed the Audi again at the gas station and asked that he keep it under surveillance on the BLC mounted on the light pole at the northeast corner of that intersection.

The SUV rounded the corner from Clifford onto Portland at approximately 9:31

and Defendant, Officer Laureano, who was also on duty, in full uniform and was operating a marked RPD car, responded to the call about the suspicious vehicle and pulled up to the Clifford/Portland intersection, heading northbound, at 9:36. Mr. Johnson had the same reaction to seeing his marked car and Officer Laureano continued northbound out of Mr. Johnson's sight.

Sgt. Robinson swiveled the BLC to the gas station parking lot and Mr. Johnson was standing alongside a silver Honda Civic speaking to the driver. The BLC footage shows them speaking for several minutes and at 9:44, the Civic leaves the gas station turning left/eastbound onto Clifford Avenue. It also shows the Audi leaving a few seconds behind it and cutting off a westbound car, nearly causing a collision, as it turned left/eastbound onto Clifford.

Sgt. Robinson radioed his observations to the Officers and the BLC footage shows the Audi proceeding eastbound to the intersection with Miller Street, followed by a white vehicle and by Officer Laureano's marked car. The footage also shows the SUV crossing the gas station parking lot and exiting eastbound onto Clifford Street at 9:45. It also shows a marked RPD car, operated by Officer Brandon Glodowski, moving eastbound on Clifford some distance behind the SUV.

As the Audi reached Miller Street, Sgt. Robinson also kept it in view on a BLC camera mounted on the north side of Clifford Avenue across from Miller Street. The footage from that camera shows the Audi turning right/southbound onto Miller Street at 9:45:22 and Officer Laureano's marked car turning right onto Miller at 9:44:29. It shows the Audi's brake lights flaring momentarily at 9:45:30 as Officer Laureano's marked car enters Miller Street, then the brake lights come on again and the Audi is travelling slowly

from 9:45:31 to 9:45:37. At 9:45:36, the footage shows Officer Laureano's brake lights coming on as he was moving closer to the Audi.

Miller Street is one-way southbound from Clifford Avenue and the BLC footage shows vehicles parked along the right/west curb, but none along the left/east curb. This is consistent with Google Street Maps photos from 2007 through 2022, all of which show vehicles parked only along the right/west curb. The BLC footage also shows that the Audi and Officer Laureano's marked cars were the only ones travelling on Miller Street from the time they entered it.

The Clifford/Miller BLC footage shows that at 9:45:38, Sgt. Robinson toggled the camera to the right because a utility pole on the west curb line obscured the view of the Audi as it was moving. The footage also shows that at 9:45:40.135, the Audi was drifting toward the right curb and at 9:45:40.300, Officer Laureano activated the emergency lights on his car. The Audi then pulls along the right curb between a couple of parked cars, without its directional signal activated and it shows Officer Laureano stopping just behind it. The footage shows that at no time after entering Miller Street and as he stopped did Mr. Johnson activate his right directional signal.

The Clifford/Portland BLC footage shows the marked SUV crossing and exiting the gas station lot at 9:45:31 and turning left and travelling eastbound on Clifford at 9:45:33. The Clifford/Miller BLC shows the SUV turning right onto Miller and 9:45:45 and the marked car operated by Officer Glodowski turning right onto Miller at 9:45:54.

Officer Laurano attests that as he was pulling up behind the Audi, and before he could put his car in park, Mr. Johnson stopped, got out of the Audi and immediately began running southbound, diagonally toward the west side of Miller, running out of his

sneakers as he did so. As soon as Officer Laureano put his car in park, he got out and pursued Mr. Johnson. The Clifford/Miller BLC shows the marked SUV stopping behind Officer Laureano's car at 9:45:54 and Officer Glodowski's marked car stopping behind the SUV at 9:46:04. As soon as the SUV stopped, Officers Perelli and Lisle got out and joined the pursuit of Mr. Johnson.

Mr. Johnson ran between the houses at 66 and 64 Miller Street and went over wooden stockade fencing and into dense vegetation in the area behind the yards of the houses on Miller and on Wright Terrace, which was the next street south on Miller. Officer Laureano avers that he lost sight of Mr. Johnson for a few seconds and then located him again after he ran alongside the house at 23 Miller Terrace onto the sidewalk, then westbound back toward Miller.

Officer Perelli continued the foot pursuit, but Officer Lisle discontinued upon reaching the stockade fences between 66 and 64 Miller and returned to the Audi. His body worn camera (BWC) footage is attached as an Exhibit to the Rule 56 Statement and shows what he did. It shows Mr. Johnson's sneakers on the road in Miller Street in the path he was running from the Audi to avoid arrest.

Officer Perelli's BWC footage begins as he was coming onto Wright Terrace alongside the house at 23 and running westbound toward Miller. It shows Officer Laureano on top of Mr. Johnson on the sidewalk and he is heard ordering Mr. Johnson to bring his hands behind his back. Prior to that, Officer Laureano was radioing his progress in chasing Mr. Johnson and the audio portions of Officer Lisle's BWC footage includes Officer Laureano saying, "Right there, right there! Get on the ground!" (at 21:46:57). Officer Laureano had a BWC, but as he attests, he apparently failed to

depress the button firmly enough to begin recording and he lost it shortly after exiting his vehicle and pursuing Mr. Johnson.

Officer Perelli's BWC footage shows him reaching Officer Laureano and Mr. Johnson and using his own handcuffs to place on Mr. Johnson's wrists. It shows that Officer Laureano apprehended Mr. Johnson alone. Additionally, it captures Mr. Johnson asking Officer Laureano to him onto his side because he was having trouble breathing, it shows Officer Laureano complying, and Mr. Johnson saying thank you. It also shows Officer Perelli turning back toward the area where Officer Laureano, Mr. Johnson and he entered Wright Terrace, asking for a nitrate dog and describing the dense vegetation behind the houses on Wright Terrace, which he described as a "jungle."

Officer Rodriguez's BWC footage shows him driving the SUV from Miller onto Wright Terrace and parking near where Officer Laureano and Mr. Johnson were. Officer Rodriguez stopped and got out, crossed over to Mr. Johnson and Officer Laureano and helped him bring Mr. Johnson to his feet. They then moved him to Officer Glodowski's marked car, where he parked it near the SUV on Wright Terrace. Custody of Mr. Johnson was transferred to Officer Glodowski to await the completion of the investigation at the scene and for Mr. Johnson's transport to the Clinton Section Office for an interview.

Sgt. Robinson arrived at the scene as Mr. Johnson was moved to Officer Glodowski's car and his and Officer Glodowski's BWC footage show that Mr. Johnson was uninjured except for a cut on the bottom of his right foot from running in socks over rough terrain, and a superficial scratch under his left eye, apparently from running

through the dense brush behind the houses on Miller and Wright Terrace. Sgt. Robinson asked if he was injured and those were the only two injuries he identified. He was not injured in the physical apprehension. After he was placed in the back of Officer Glodowski's car and as he awaited the arrival of the ambulance Sgt. Robinson summoned to evaluate his foot cut and scratch, Mr. Johnson asked Officer Glodowski to speak to him to bide the time and he advised that he was so tired and out of shape that he was quickly caught and that that would have been the case even if he had not run out of his sneakers. Officer Laureano likewise avers that Mr. Johnson appeared physically spent from the foot chase and it took almost no effort to bring him down and handcuff him.

A male and female EMT arrived with the Ambulance and the male evaluated Mr. Johnson. He treated the right foot cut and advised that the sensation Mr. Johnson described under his left eye was a superficial scratch, which did not require treatment. Mr. Johnson described no other injuries and did not request transport to a hospital for evaluation. He did, however, make several extemporaneous, unsolicited admissions, which are dispositive of this suit. All of this is captured on Officer Glodowski's BWC.

From nearly the beginning of Mr. Johnson's interaction with Officer Glodowski, and after asking him to engage in conversation, Mr. Johnson asked about the possibility of speaking with a supervisor at the scene. He revealed that he was on parole for nearly two years and was not supposed to be outside because of his 8:00 p.m. curfew, which is why he "hauled ass." Officer Glodowski's BWC footage is divided into five clips and these statements begin the second clip. Mr. Johnson described that he was caring for his "baby mama" and their year old child, as well as for the three children of his

girlfriend and his overarching concern at that point was to try to avoid revocation of his parole by speaking with a supervisor at the scene who might forgive him being out after curfew.  He continuously asked Officer Glodowski about the chances of a "deal" being made and hoping that whoever he spoke with would be reasonable.  He added that in retrospect, he believed he should have stayed with his vehicle, as it would have made him appear more reasonable and would have enhanced his chances of striking a deal to be released.  He explained, however, that he was trying to avoid a parole violation and asked Officer Glodowski, "what would you do? I'm on parole dude.  What did you expect?  You'd have run too.  I'm not supposed to be outside" (Glodowski BWC, clip 2—22:07:45 to 22:07:51).

On clip 3 of Officer Glodowski's BWC footage, Mr. Johnson expresses regret about having run and said that the Officers would have caught him regardless of whether his sneakers were tied and stayed on, as he got very tired and explained that he had not worked out since being released to parole supervision.  Clip 4 of Officer Glodowski's BWC footage shows Mr. Johnson's further efforts to avoid booking and to try to work out a deal to be released without a parole violation.  That clip captured the transport to the Clinton Section Office and Mr. Johnson explained again that he ran because he was on parole and was not supposed to be outside at that hour—"I'd rather take a chance and run and still be able to … you know what I'm saying?  If you were put in this situation, you'd …" (22:30:27 to 22:30:38).

Although it is alleged in the Amended Complaint that Officer Laureano ordered Mr. Johnson out of the Audi at gunpoint, all of the statements Mr. Johnson made to Officer Glodowski establish that he got out of the Audi and ran as soon as it stopped.

Moreover, Officer Laureano's and Officer Wagner's averments establish that Officer Lauerano did not have a chance to even draw his sidearm because Mr. Johnson was out of the Audi and running before Officer Laureano could get out of his car.  Further, they both aver that ordering a vehicle driver out during a traffic stop before back-up arrived, and without knowing the number of occupants or whether they were armed, would have violated RPD policy.

During transport to the Clinton Section Office, Mr. Johnson made key extemporaneous, unsolicited admissions to Officer Glodowski about what he was doing on Miller Street.  He advised that he had received a text message from a neighbor who lived in the same apartment building and who advised that he was on Miller Street and asked for a ride home.  Mr. Johnson said that he was driving on Miller looking for that person and said, "I just seen the car behind me and I thought [WTF?!] I didn't even know that was the police."  Officer Glodowski said, Yeah?", to which Mr. Johnson said, "Nah, I was pulling to the side—I was supposed to—I was … he was coming over to the area.  I was about to drop him off before I went in the house.  He said he was walking down Miller.  That's when I turned and I look and the lights go on.  I'm like, [WTF]?!" (Glodowski clip 3—22:31:10 to 22:31:25).

Mr. Johnson's statements describe a chronology, including his lack of awareness that the car behind him was a police car, as he "was pulling to the side" and as he was looking for his neighbor.  That pulling or drifting is what Officer Laureano describes in his Declaration and is what provided probable cause for the traffic stop for violation of V&TL §1163(d).

Clip 4 of Officer Glowdowski's BWC footage ends with he and Mr. Johnson

arriving at the Clinton Section Office and being joined by Officer Brian Jones.  Mr. Johnson continued to ask about the possibility of having a deal worked out with a supervisor and asked Officer Glodowski to be honest with him about his prospects after being brought there.  He and Officer Jones advised that they were instructed to move him to the Public Safety Building (PSB) because the Investigators who were going to interview him were working there.  Clip 5 of Officer Glodowski's BWC footage opens at the Clinton Section Office and captured the transport to the PSB.  As he was advised about the move, Mr. Johnson expressed resignation that, "it's pointless talking to them if I'm going downtown," believing that a deal could not be worked out.  Again that was his overarching concern that evening.

On Officer Glodowski's clip 5, he removes the handcuffs from Mr. Johnson's wrists and notices a slight bump on his right wrist.  He asked Mr. Johnson if he broke it from fighting and Mr. Johnson said that it happened when he was a kid.  He never complained about the handcuffs being too tight, or about his wrist hurting, however, and made no complaints about any other injuries, though it was apparent that the bottom of right foot was tender from the cut as he was moved from one Police Station to another.

An inventory search of the Audi was performed before it was towed from Miller Street and a stolen, loaded .38 caliber pistol was discovered in a drawer under the front passenger seat.  A serial number on one part had been partially defaced, but another was not and it was determined that the gun was reported stolen from a residence in Sweden, New York in 2015.  So, among other things, Mr. Johnson was charged with second degree criminal possession of a weapon, which was one of the offenses for which he was serving a sentence previously and was on parole.  He was indicted by a

grand jury and when the Division of Parole became aware of what had occurred, a parole hold was placed, causing him to remain in jail during the pendency of the criminal action.

During that action, New York State Supreme Court Justice, Charles A. Schiano, Jr., conducted a Mapp Hearing to determine whether there was probable cause for the traffic stop. Based upon his own view of the Clifford/Miller BLC footage, Justice Schiano determined that Officer Laureano activated his emergency lights before Mr. Johnson had pulled into the curb. His view was not the same as Officer Laureano's line of sight view because of the slight angle of the BLC camera to where the Audi stopped. Based on his own view of that footage, Justice Schiano determined that there was not probable cause for the stop and the criminal action was terminated shortly thereafter.

Mr. Johnson commenced this suit in Monroe County Supreme Court and the Defendants removed it to this Court. Shortly thereafter Mr. Johnson filed an Amended Complaint. There first seven Causes of Action are New York State law claims and last three are federal claims under 42 U.S.C. §1983. This Court entered an initial Scheduling Order and two Amended Orders (Dkt #s 6, 11 and 20). Paper discovery was exchanged and both sides determined not to conduct depositions.

The first four Causes of action are State law claims against Officer Laureano, the only named individual Defendant, for false arrest and false imprisonment, malicious prosecution, assault and battery, and "injurious falsehood," which appears to be based upon the allegation that he fabricated the basis for the traffic stop. The Fifth through Seventh Causes of Action are State law claims directed at the City. They allege negligent hiring, training, supervision and retention and the the City's *respondeat*

*superior* liability for Officer Laureano's alleged intentional tort of fabrication of the basis for the traffic stop.  The Eighth through Tenth Causes of Action are claims under §1983 for malicious prosecution, Officer Laureano's alleged fabrication of evidence, and his alleged failure to intervene.  For the reasons which follow, none of these ten Causes of Action are legally or factually meritorious, based largely upon the words out of Mr. Johnson's own mouth, as well as upon the BLC and BWC footage.  Accordingly, it is submitted that the City and Officer Laureano are entitled to summary judgment and to dismissal of this action and that Officer Laureano is also entitled to qualified immunity.

**ARGUMENT**

**POINT I**

**THE RULES REGARDING SUMMARY JUDGMENT.**

Under FRCP Rule 56(c), summary judgment is appropriately granted where the moving papers and the supporting affidavits "show that there is no genuine issue as to any material fact and that the moving parties are thus entitled to summary judgment as a matter of law" (Anderson v. Liberty Lobby, Inc., 477 U.S. 242 [1986]).  It is the moving parties' initial burden to "inform the district court of the basis for its motion, and [to demonstrate] the absence of a genuine issue of material fact" (Celotex v. Catrett, 477 U.S. 317, 323 [1986]).

Once the moving parties meet their initial burden, as the Defendants here have done, the opposing party bears the burden of "making a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial" (Celotex, *supra*, at 322; and FRCP 56(e)).  Summary judgment is appropriately granted where no rational jury could find in favor of the non-

moving party because there is no genuine issue of material fact (Gallo v. Prudential Residential Services, Ltd., 22 F.3d 1219, 1224 [2d Cir. 1994]).

In deciding a summary judgment motion, a court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment" (Spinelli v. City of New York, 579 F.3d 160, 166 [2d Cir. 2009]; quoting Brown v. Henderson, 257 F.3d 246, 251 [2d Cir. 2001]). It is settled, however, that the opponent does not meet his counter burden by reliance upon mere speculation or conjecture as to the true nature of the facts in order to overcome a summary judgment motion. "[M]ere conclusory allegations or denials … cannot by themselves create a genuine issue of material fact where none would otherwise exist" (Hicks v. Baines, 593 F.3d 159, 166 [2d Cir. 2010]; quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 [2d Cir. 1995]).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial" (Matsushita Elec. Indus. Co. v Zenith Radio Corp., 475 U.S. 574, 587 [1986], internal quotations omitted).

### POINT II

### THE FIFTH AND SIXTH CAUSES OF ACTION CONTAINED IN THE AMENDED COMPLAINT, ALLEGING NEGLIGENT SCREENING, HIRING, RETENTION, TRAINING, RETRAINING AND SUPERVISION, ARE NOT MAINTAINABLE, AS A MATTER OF LAW, AND MUST BE DISMISSED.

The Fifth and Sixth Causes of Action allege negligent screening, hiring and retention, and negligent training, retraining and supervision, respectively. They were also included in the original Complaint when this action was venued in New York State Supreme Court and were and are clearly not intended to be Monell claims (Monell v

Department of Social Services, 436 U.S. 658 [1978]).  In fact, none of the allegations comprising those Causes of Action include any such allegations.

As a matter of settled law, there can be no negligent hiring, training, supervision or retention cause of action maintainable against an employer for the torts of an employee acting within the scope of his employment because such a cause of action is unnecessary.

> "[U]nder New York Law, where a municipal employee is acting within the scope of his employment, the municipality's respondeat superior liability precludes a claim based on negligent hiring, supervision and training (Rodriguez v City of Rochester, 2015 U.S. Dist. LEXIS 125178, at **14-15 [W.D.N.Y. 2015], citing and quoting Velez v City of New York, 730 F.3d 128, 137 [2d Cir., 2013—"if the employee acted within the scope of her employment, the employer and the employee's supervisors may be held liable for the employee's negligence only under a theory of respondeat superior [,] ... because if the employee was not negligent, there is no basis for imposing liability on the employer, and if the employee was negligent, the employer must pay the judgment regardless of the adequacy of the training," citing Karoon v NYCTA, 241 AD2d 323, 324 [1st Dept., 1997]; and see Rosetti v Board of Education, 277 AD2d 668, 670 [3d Dept., 2000], Malay v City of Syracuse, 151 AD3d 1624, 1626-1627 [4th Dept., 2017], Brown v First Student, Inc., 167 AD3d 1455, 1456 [4th Dept., 2018], and Watson v Strack, 5 AD3d 1067, 1068 [4th Dept., 2004]).

At paragraph 4 of the Amended Complaint, it is alleged that Officer Laureano was at all times employed by the City of Rochester and was acting for, upon, and in the course of and in furtherance of the business of his employer, Rochester Police Department, and within the scope of his employment. In their Answer, the Defendants admit that.  The only exception to the well settled law precluding maintenance of a negligent hiring, training, supervision and retention cause of action against an employer

for the torts of employee is where punitive damages might be obtainable from the

employer, but they cannot be awarded against a municipality (Sharapata, 56 NY2d 332,

338-339 [1982] and Karoon, *supra*, at 342). Thus, it is respectfully submitted that the

Fifth and Sixth Causes of Action must be dismissed.

### POINT III

### THE THIRD CAUSE OF ACTION, ALLEGING ASSAULT AND BATTERY, IS BASELESS, GIVEN THE UNDISPUTED FACTS IN THIS CASE, AND MUST THUS BE DISMISSED.

It is well-settled that:

> "The test for whether a plaintiff can maintain a New York State law assault and battery cause of action against law enforcement officials is the exact same test as the one used to analyze a Fourth Amendment excessive force claim" (Benson v Yaeger, 2009 U.S. Dist. LEXIS 47555, at *11, n.6 [W.D.N.Y. 2009], quoting Chen v City of Syracuse, 2009 U.S. Dist. LEXIS 16227 [N.D.N.Y. 2009]).
>
> ***
>
> "Except for §1983's requirement that the tort be committed under color of state law, the essential elements of excessive force and state law assault and battery claims are substantially identical" (Gustafson v Village of Fairport, 106 F. Supp.3d 340, 351, quoting Humphrey v Landers, 344 F. App'x 668, 688 [2d Cir., 2009 (summary order); and see, Posr v Doherty, 944 F.2d 91, 94-95 [2d Cir., 1991], Nix v City of Rochester, 2017, U.S. Dist. LEXIS 123808, at **10-11 [W.D.N.Y. 2017] and Rodriguez, *supra*, at *12).

According to the seminal case on excessive force, Graham v Connor, 490 U.S.

386, 394-396 [1989], it is properly analyzed under the Fourth Amendment and its

"objective reasonableness" standard. A plaintiff alleging the use of excessive force

must demonstrate that it was objectively unreasonable in the circumstances. The Court

held that:

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable police officer on the scene, rather than with the 20/20 vision of hindsight. … With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: 'Not every push or shove even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.  As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation" (Id. at 396-397, quoting and citing, *inter alia*, Terry v Ohio, 392 U.S. 1, 20-22 [1968], and Scott v United States, 436 U.S. 128, 137-139 [1978]).

The force used by Officer Laureano to apprehend Mr. Johnson clearly was not unreasonable or excessive.  According to his Declaration testimony and to the statements Mr. Johnson made voluntarily and extemporaneously to Officer Glodowski, he was so tired that, in retrospect, he thought that perhaps he should not have run and that he would have been caught even if his sneakers were tied and had not come off. Officer Laureano avers that Mr. Johnson was obviously fatigued to the point where he could not continue running, though he initially got down into a push up position and got up and tried to flee.  Officer Laureano avers it took almost no effort to bring Mr. Johnson down and under control, as Mr. Johnson's own statements corroborate.  Further, his statements and what is observable on the footage, particularly Officer Glodowski's, illustrate that he was uninjured except for the cut on his foot from running in stocking

feet and sustaining a scratch under his left eye as a result of running through heavy vegetation.

In paragraph 59 under the Third Cause of Action, it is alleged that Officer Laureano agreed and conspired to commit assault and battery upon Mr. Johnson and it is elsewhere alleged that he so conspired. Officer Perelli's and Officer Rodriguez's BWC footage illustrate that Officer Laureano caught and apprehended Mr. Johnson alone—there were no other Officers present. Officer Perelli provided his own handcuffs and affixed them to Mr. Johnson's wrists after Mr. Johnson was on the ground. Officer Rodriguez simply lent assistance in bringing Mr. Johnson to his feet after the handcuffing. There was thus no one for Officer Laureano to conspire with.

Further, there is no allegation that any of the other Officers were personally involved in Mr. Johnson's physical apprehension, so there can be no cause of action against any of them if that were alleged. Even if they had been involved, however, the intracorporate conspiracy doctrine precludes a cause of action for conspiracy against any of them because they were all members of the same police force (Jones v City of Rochester, 220 U.S. Dist. LEXIS 186439, at **7-8 and 19-20 [W.D.N.Y. 2020], Hartline v Gallo, 546 F.3d 95, 99, n.3 [2d Cir., 2008], Ivery v Baldauf, 284 F. Supp.3d 426, 440 [W.D.N.Y. 2018], Zilioli v City of New York, 220 U.S. Dist. LEXIS 57704, at **12-13 [S.D.N.Y. 2020], Broich v Inc. Vill. of South Hampton, 650 F. Supp.2d 234, 246-247 [E.D.N.Y. 2009], and Savarese v City of New York, 547 F. Supp.3d 305, 343-344 [S.D.N.Y. 2021]). Accordingly, no conspiracy claim will lie here.

POINT IV

## THE UNDISPUTED FACT THAT OFFICER LAUREANO ACTED ALONE IN APPREHENDING MR. JOHNSON VITIATES THE TENTH CAUSE OF ACTION ALLEGING FAILURE TO INTERVENE.

Mr. Johnson's Tenth Cause of Action, asserting failure to intervene under federal law, is factually and legally unsupportable.  It is undisputed that Officer Laureano was alone when he caught and apprehended Mr. Johnson, as Officer Perelli's and Officer Rodriguez's BWC footage illustrate.  It is settled that:

> "Where the officer is a direct participant in the alleged unlawful conduct, the failure to intervene theory of liability is inapplicable (Sanabria v Tezlof, 216 U.S. Dist. LEXIS 107104, at *17 [S.D.N.Y. 2016], citing Simon v City of New York, 2011 U.S. Dist. LEXIS 9515 [E.D.N.Y. 2011]—dismissing a plaintiff's claim as futile for failure to intervene 'because these same officers actually arrested her'.  "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite for an award of damages under §1983' " (Sanabria, *supra*, at *16, quoting Brovost v City of Newburgh, 262 F.3d 146, 154 [2d Cir., 2001] and Wright v Smith, 21 F.3d 496, 501 [2d Cir., 1994]).

The case law on point presupposes the presence of more than one Officer—the actor and an observer—and requires that the observing Officer perceive a constitutional violation by the actor and has a reasonable opportunity to intervene and that upon the failure to do so, the observing Officer becomes a "tacit collaborator" in the illegality (Figueroa v Mazza, 825 F.3d 89, 106 [2d Cir., 2016], citing O'Neill v Krzemiski, 839 F.2d 9, 11-12 [2d Cir., 1988]; and see, Anderson v Branen, 17 F.3d 552, 557 [2d Cir., 1994]).

In view of all of this and of Officer Laureano's lone apprehension of Mr. Johnson, the absurdity of a failure to intervene claim against him is manifest. It is thus respectfully submitted that it must be dismissed.

**POINT V**

**THE FOURTH, SEVENTH AND NINTH CAUSES OF ACTION ARE FATALLY UNDERCUT BY MR. JOHNSON'S STATEMENTS TO OFFICER GLODOWSKI AND SHOULD BE DISMISSED.**

The Fourth and Seventh Causes of Action are brought under State law. The former appears to be directed at Officer Laureano and the latter at the City for the same alleged intentional falsehoods, for which it is alleged that the City is liable under *respondeat superior*.

The Ninth Cause of Action appears to be redundant of the Fourth, except that the Ninth is brought under Federal Law—i.e., §1983 and the Fourth, Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution. The Ninth also appears to be directed exclusively at Officer Laureano, though reference is made to "the individual Defendants jointly and severally" (Amended Complaint ¶88, p. 14). Only Officer Laureano is a named individual Defendant and there are no claims regarding any John Doe Defendants.

The Fourth Cause of Action is more factually specific than the Ninth, though the gist of both is that Officer Laureano allegedly deliberately and intentionally made false sworn statements and offered the same false testimony at a Mapp Hearing in the underlying criminal action about the basis for the traffic stop. In short, it is alleged that Officer Laureano intentionally lied that he pulled Mr. Johnson's vehicle over for failure to signal, in violation of NY Vehicle and Traffic Law §1163(d) (Amended Complaint, ¶s 62

through 65). It is also alleged that Officer Laureano ordered Mr. Johnson out of his car at gunpoint, which is directly contrary to Officer Laureano's and Officer Wagner's sworn testimony (Laureano and Wagner Declarations) and to the statements Mr. Johnson made at the scene about being out of his vehicle and running as soon as it stopped because he did not want to risk a parole violation.

The Ninth Cause of Action is based upon the same allegations of Officer Laureano's intentional and deliberate lying, which he allegedly did under color of state law. Apparently, that allegation was included in order to implicate §1983 and the aforesaid Constitutional Amendments. Otherwise, there is no apparent difference between this and the Fourth Cause of Action.

Officer Laureano attests in his Declaration that he observed the Audi moving slowly and with the brake lights intermittently coming on and the Audi drifting to the right from the lane of travel. Mr. Johnson likewise stated, extemporaneously and voluntarily to Officer Glodowski, that "I just saw the car behind me and I thought, [WTF]?! I didn't even know it was the police. ... I was pulling to the side—I was supposed to—I was (garbled) he was coming over to the area. I was about to drop him off before I went in the house. He said he was walking down Miller. That's when I turned, I look and the lights go on. I'm like, [WTF]?!" (Glodowski BWC—22:31:10 to 22:31:25). Officer Wagner attests to the same observation—i.e., the Audi drifting to the right before Officer Laureano activated his emergency lights.

Mr. Johnson was describing a chronology and he indicated that he did not know that the car behind him was a police car as he was pulling the Audi to the side. This was clearly before Officer Laureano activated the emergency lights because that gave

Mr. Johnson notice that the car behind him was a police car. In other words, what he describes—pulling to the side, apparently looking for his friend, who he was supposed to give a ride home—occurred before the emergency lights were activated. Officer Laureano thus clearly was not lying about what he saw Mr. Johnson doing. Again, this fatally undercuts both the Fourth and Ninth Causes of Action.

It also fatally undercuts the Seventh Cause of Action, which is directed exclusively at the City under *respondeat superior*. Although the City could be vicariously liable for the intentional tort of an employee acting within the scope of his employment, where there is no underlying liability on the part of the individual Defendant, the City has no vicarious liability (See, e.g., Rivera v State of New York, 34 NY3d 383, 390 [2019], Boyler v City of Lackawanna, 287 F. Supp.3d 308, 327 [W.D.N.Y. 2018] and Williams v City of New York, 2023 U.S. Dist. LEXIS 34364, at **12-13 [S.D.N.Y. 2023], citing Ferreira v City of Binghamton, 975 F.3d 255, 278 [2d Cir., 2020]—finding it 'certainly correct' that 'a respondeat superior claim cannot survive unless based on demonstrated entitlement to recover against its employee' ").

Again, the words out of Mr. Johnson's own mouth to Officer Glodowski describe exactly what Officer Laureano observed, which is what is seen on the BLC footage from the Clifford/Miller camera, and what Officer Wagner describes. Mr. Johnson was looking for the friend who said he was on Miller Street and was "pulling to the side" before he realized that there was a police car behind him. The Clifford/Miller BLC footage shows that Mr. Johnson never signaled right while on Miller and the drifting right without signaling was the V&TL §1163(d) offense. Again, this vitiates the fabrication claim and is thus dispositive of the claim against the City under *respondeat superior*.

Accordingly, it is respectfully submitted that the Fourth, Seventh and Ninth Causes of Action should be dismissed.

## POINT VI

### MR. JOHNSON'S OWN STATEMENTS ESTABLISH PROBALE CAUSE FOR HIS ARREST AND PROSECTION AND ARE THUS A COMPLETE DEFENSE TO, AND ARE DISPOSITVE OF, THE FIRST, SECOND AND EIGHTH CAUSES OF ACTION.

The First Cause of Action asserts a State law claim for false arrest and false imprisonment, and the Second and Eighth assert a State law and Federal claim for malicious prosecution, respectively. All are fatally undercut by Mr. Johnson's own statements, which establish probable cause for the traffic stop, and which is a complete defense to, and dispositive of, all three of these Causes of Action.

Under both State and federal law, a traffic stop may be effected for even a minor offense and provide probable cause for it and for a driver's arrest. NY Vehicle & Traffic Law §155 provides that, "For purposes of an arrest without a warrant, pursuant to article one hundred forty of the Criminal Procedure Law, a traffic infraction shall be deemed an offense." NY CPL §140.10(1)(a) provides that, "Subject to the provisions of subdivision two (regarding geographic jurisdiction), a police officer may arrest a person for: (a) any offense when he or she has reasonable cause to believe that such person has committed such offense in his or her presence." V&TL §1163, governing "turning movements and required signals," provides in paragraph (d) that, "The signals provided in section 1164 shall be used to indicate an intention to turn, *change lanes*, or start from a parked position ... ." A traffic stop may be effected and the driver arrested for a violation of this provision (People v Terrero, 139 AD2d 830, 831-832 [3d Dept., 1988]).

The same is true under federal law:

> "If an officer has probable cause to believe that an
> individual has committed even a very minor criminal
> offense in his presence, he may, without violating the
> Fourth Amendment, arrest the offender" (Atwater v City
> of Lago Vista, 532 U.S. 318, 354 [2001]—violation of
> Texas seatbelt law). (See also, U.S. v Scopo, 19 F.3d
> 777, 781-782 [2d Cir., 1994]—unsignaled lane change
> in violation of V&TL §1163(d), and U.S. v Brown, 2016
> U.S. Dist. LEXIS 119881, at **10-11 [W.D.N.Y. 2016]).

Mr. Johnson's own statements, Officer Laureano's and Officer Wagner's averments, the Clifford/Miller BLC footage, and V&TL §1163(d) all establish that once Mr. Johnson began "pulling to the side" while looking for his friend, without signaling and without knowing that the car behind him was a police car, the offense was committed and Office Laureano need not have waited for Mr. Johnson to actually pull over to the curb to activate his emergency lights and stop him. Mr. Johnson's drifting out of the travel lane without signaling was the complete offense.

Further, because this implicates the Fourth Amendment's reasonableness standard, a police officer's subjective intent or state of mind in effecting a traffic stop and arrest is irrelevant (U.S. v Scopo, *supra*, at 782-783; and Heien v North Carolina, 574 U.S. 54, 66-67 [2014]—reasonable suspicion is all that is required for a traffic stop and a mistake is of no moment).

It is well-settled that false arrest and false imprisonment claims are essentially the same under State and federal law (Weyant v Okst, 101 F.3d 845, 852 [2d Cir., 1996], citing, *inter alia*, Lennon v Miller, 66 F.2d 416, 423 [2d Cir., 1995], Singer v Fulton County Sheriff, 63 F.3d 110, 118 [2d Cir., 1995], cert. denied 116 S.ct 1676 [1996], and Posr, *supra*, at 96). Further, probable cause is a complete defense to these

causes of action, whether brought under State or federal law (Bernard v U.S., 25 F.2d

98, 102 [2d Cir., 1994] and Broughton v State, 37 NY2d 451, 458 [1975]).  Probable

cause is also a complete defense against malicious prosecution causes of action,

whether brought under State or federal law Husbands ex rel. Forde v City of New York,

335 F. App'x 124, 128 [2d Cir., 2009] (summary order)), citing Jenkins, v City of New

York, 478 F.3d 76, 84 [2d Cir. 2007], Weyant, *supra*, at 852, and Jocks v Tavernier, 316

F.3d 128, 136 [2d Cir., 2008]).  It is also settled that the question of probable cause may

be determinable as a matter of law if there is no dispute concerning the pertinent events

and the knowledge of the police officer (Bernard, *supra*, at 852, citing Singer, *supra*, at

116-119, and (Husbands, *supra*, at 128.

The Supreme Court has provided guidance to determine when a law

enforcement officer has probable cause for an arrest:

> "To determine whether an officer had probable cause
> for an arrest, we examine the events leading up to the
> arrest, and then decide whether these historical facts,
> viewed from the standpoint of an objectively
> reasonable police officer, amount to probable cause.
> Because probable cause deals with probabilities and
> depends on the totality of the circumstances, it is a fluid
> concept that is not readily, or even usefully, reduced to
> a neat set of legal rules.  It requires only a probability
> or substantial chance of criminal activity, not an actual
> showing of such activity.  Probable cause is not a high
> bar" (District of Columbia v Wesby, 138 S.Ct. 577, 586
> [2018], internal quotations and citations omitted).

The Supreme Court has also cautioned against viewing facts in isolation to

determine whether probable cause exists—it has cautioned against this sort of "divide-

and-conquer" analysis, as that is precluded by the totality-of-the-circumstances test,

which requires courts to consider the whole picture, observing that "the whole is often

greater than the sum of its parts—especially when the parts are viewed in isolation"

(D.C. v Wesby *supra*, at 588, internal quotations and citations omitted; and see, United

States v Delossantos, 536 F.3d 155, 161 [2d Cir., 2008]—the probable cause standard

is far below that of reasonable doubt; and see Husbands, *supra*, at 127).

      The Second Circuit has also observed that:

> "The Supreme Court has repeatedly stated that the
> probable-cause standard is a practical, nontechnical
> conception that deals with the factual and practical
> considerations of everyday life on which reasonable
> and prudent men, not legal technicians, act. Because
> the standard is fluid and contextual, a court must
> examine the totality of the circumstances of a given
> arrest. These circumstances must be considered from
> the perspective of a reasonable police officer in light of
> his training and experience (Delossantos, *supra*, at
> 159, internal quotations and citations omitted).

      Here, the facts of what occurred are undisputed, or cannot be credibly disputed,

given that they are based in significant part on the words from Mr. Johnson's own

mouth. He was on parole and was violating his curfew on both occasions when the

Police Officers riding in a marked SUV observed him and when Officer Laureano first

observed him, which well-explains why he was acting so suspiciously—keeping them

under watch as they were keeping him under watch until they decided to pull back out of

his sight and allow Sgt. Robinson to observe him on the BLCs. Mr. Johnson's

overarching concern that evening was not being caught violating his curfew and risking

revocation of his parole. He struck up a conversation with Officer Glodowski by asking

who he might speak to to attempt to "work out a deal" to avoid the parole violation. That

continued until he was moved to the Public Safety Building to await an interview by

Investigators. That was also how he explained his running as soon as he realized that

he was being stopped by a police car on Miller Street and about which he expressed regret, in retrospect, as he believed that staying with the vehicle might have enhanced his chances of being released.

Mr. Johnson received a text message on his phone while at the gas station at Clifford and Portland from a neighbor asking for a ride home to the apartment building where they both lived and advised that he was walking on Miller Street. While Mr. Johnson was driving on Miller, he braked several times, though there was no traffic ahead of him and he had a clear lane of travel. He was moving quite slowly as if he was looking for his neighbor. He told Officer Glodowski that before he even knew that the car behind him was a police car, he was "pulling to the side"—i.e., moving from the travel lane—as if looking for his friend. Mr. Johnson did not signal then, which was the V&TL §1163(d) offense, nor did he signal when Officer Laureano activated his emergency lights and he realized that he was being stopped by the car behind him which he now knew was a Police car. These statements, as well as Officer Laureano's and the Clifford/Miller BLC footage all provided probable cause for his stop and arrest. This, as well as his flight on foot as soon as he stopped his car and before Officer Laureano could put his in park and get out, provided probable cause for the traffic stop and arrest, as well as for the Obstruction of Governmental Administration and the Resisting Arrest charges, and thus vitiates the State and Federal malicious prosecution Causes of Action (Second and Eighth), the elements of which are identical under State and federal law and for both of which, probable cause is a complete defense (Collum v Freeport, 691 F. Supp. 637, 640 [E.D.N.Y. 1988], Bernard, *supra*, at 104 and Broughton, *supra*, at 457, and Husbands, *supra*, at 128—"the existence of probable

26

cause to arrest [the plaintiff] defeats his claims for false arrest and malicious prosecution"—citing Jenkins, *supra*, at 84). In view of all of this, it is respectfully submitted that Mr. Johnson's First, Second and Eighth Causes of Action should be dismissed.

Justice Schiano's differing view of what he saw on the Clifford/Miller BLC footage and his Decision and Order determining that there was not probable cause for the stop have no preclusive effect and are of no moment to the resolution of the issues presented in this suit, as Second Circuit's holding in Jenkins establishes (*supra*, at 85-86). There, a criminal court Judge's determination regarding probable cause to arrest was determined to have no preclusive effect because the elements of collateral estoppel under New York law were absent. Specifically, the Second Circuit determined that neither the municipality, nor its police officers, were in privity with the State or the District Attorney—they "[did] not stand in sufficient relationship to apply the doctrine of collateral estoppel" (citing Brown v City of New York, 60 NY2d 897, 898 [1990]). The same is true here—neither the City, nor Officer Laureano, or Officer Lisle who also testified at the Mapp Hearing, were in privity with the District Attorney's office. Consequently, Justice Schiano's determination has no bearing on this suit and cannot be considered.

It is further respectfully submitted that even if probable cause were not established by, and manifest from, the record proof, Officer Laureano would be entitled to qualified immunity on the Causes of Action asserted against him, based upon arguable probable cause. This Court has observed that:

> "An officer is entitled to qualified immunity against a suit
> for false arrest if he can establish that he had arguable

probable cause to arrest the plaintiff. Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met" (Harris v Swaggard, 2022 U.S. Dist. LEXIS 32864, at **6-7 [W.D.N.Y. 2022], internal quotations omitted, but citing Garcia v Doe, 779 F.3d 84, 92 [2d Cir., 2015] and Zalaski v City of Hartford, 723 F.3d 382, 390 [2d Cir., 2013]).

This Court has also observed that qualified immunity and arguable probable

cause also applies to a claim of malicious prosecution (Id., at *10, citing Tompkins v City

of New York, 50 F. Supp.3d 426, 435 [S.D.N.Y. 2014] and Jean v Montina, 412 F. App'x

352, 354 [2d Cir., 2011] (summary order)).

The Second Circuit has observed that:

"Thus, the analytically distinct test for qualified immunity is more favorable to the officers than the one for probable cause; arguable probable cause will suffice to confer qualified immunity for the arrest" (Escalera v Lunn, 361 F.3d 737, 743 [2d Cir., 2004]).
***
"Finally, we have said that in the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show arguable probable cause. This is because at its heart, the concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. Officers can have reasonable, but mistaken beliefs as to the facts establishing the existence of probable cause … and in those situations, courts will not hold that they have violated the Constitution. Therefore, in situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity" (Calderola v Calabrese, 298 F.3d 156, 162 [2d Cir., 2002], internal citations and quotations omitted).

Additionally, the Second Circuit has observed that:

"[Q]ualified immunity employs a deliberately forgiving standard of review that provides ample protection to all but the plainly incompetent or those who knowingly violate the law.  In evaluating this argument [—i.e., whether probable cause or arguable probable cause exists], we are mindful not only that qualified immunity is a forgiving standard but also that probable cause is a fluid one that does not demand hard certainties or mechanistic inquiries—it is a practical, common-sensical, all-things-considered standard for assessing probabilities in particular factual context" (*Zalaski*, *supra*, at p. 389, internal quotations and citations omitted).

Lastly, the Second Circuit has observed that while qualified immunity provides protection to an official from liability under federal causes of action, a similar doctrine exists under New York common-law and if a law enforcement defendant is entitled to qualified immunity under federal law, summary judgment would be similarly appropriate on state law claims (Jenkins, *supra*, at 86-87).  And, per this Court's holding in Harris (*supra*, at *10), this also applies to state and federal malicious prosecution claims.

Mr. Johnson's own statements just after his arrest, while he was speaking voluntarily and extemporaneously with Officer Glodowski, were that as he was driving on Miller Street looking for his neighbor and he was "pulling to the side" before he realized that a police car was behind him.  The BLC footage from the Clifford/Miller camera shows that he braked intermittently and was slowing, which is consistent with him looking for his neighbor, who told him that he was walking somewhere on Miller Street.  Whether Mr. Johnson was drifting simply because he was looking to his right and was unconsciously moving to the right, or whether he was deliberately slowing to find a spot to stop to contact his friend to determine where he was, this would understandably create the impression for any reasonable Police Officer that Mr.

Johnson was leaving the travel lane without signaling and the BLC footage establishes that he never signaled to the right before he knew that a marked police car was behind him, or after he became aware when Officer Laureano activated his emergency lights. Officer Laureano avers in his Declaration that this was his impression. It was not necessary for Mr. Johnson to fully park against the right curb for the violation of V&TL §1163(b) to have occurred. It is thus respectfully submitted that even if probable cause were not established by the undisputed facts, including Mr. Johnson's own statements, and were not manifest on the record proof, Officer Laureano would be entitled to qualified immunity and to dismissal of all causes of action against him, pursuant to FRCP Rule 56. It is thus respectfully urged that this Court grant him that relief.

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that there is no legal or factual merit to any of the Causes of Action contained in the Amended Complaint and that the City and Officer Laureano are thus entitled to summary judgment, pursuant to FRCP Rule 56. It is further submitted that Officer Laureano is entitled to qualified immunity and to dismissal of this suit.

DATED: June _30_, 2023
        Rochester, New York            Respectfully submitted,

                                LINDA S. KINGSLEY, Corporation Counsel

                                BY: _____

                                (CHRISTOPHER S. NOONE, Esq., of Counsel
                                Attorneys for Defendants
                                30 Church Street, Room 400A City Hall

Rochester, New York 14614
Telephone: (585) 428-6753
chris.noone@cityofrochester.gov