UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF NEW YORK

---

DEVIN JOHNSON,

                Plaintiff,

-v-

The CITY OF ROCHESTER and ROCHESTER
POLICE OFFICER JONATHAN LAUREANO,

                Defendants.

**DECLARATION**

**Civil No. 21-CV-6683(DGL/MWP)**

---

STATE OF NEW YORK)
COUNTY OF MONROE)  ss.:

**JONATHAN LAUREANO**, being first duly sworn, deposes and says as follows:

1.    I have been employed as a Police Officer with the City of Rochester's Police Department since 2010, I am a named Defendant in this action and I make this Declaration in support of the motion for summary judgment made on my behalf and on the behalf of the City.

2.    I was working on the evening on Saturday, August 24, 2019, I was in full uniform, operating a marked Police car and was assigned to a patrol beat in the Clinton Section. I received a call that evening from my fellow officer, Philip Perelli, asking any available Officer in the Clinton Section for assistance in locating a black Audi Q7 SUV bearing New York license plate number GPB 2190, which he had observed several minutes earlier at 5 Lincoln Street, which was a known gang and drug house. Specifically, assistance was requested to stop the Audi and identify the driver.

3.    I was driving on Portland Avenue northbound and arrived at the intersection with Clifford Avenue at approximately 9:36. There is a blue light camera (BLC) mounted on the light pole on the northeast corner of that intersection and the footage shows my vehicle arriving and

stopping at the intersection on Portland, then continuing when the light changed and passing the gas station located on the northeast corner. I understand that this footage is submitted as an exhibit to the Rule 26 Statement supporting our motion. Officer Perelli had provided an update, advising that the Audi and its driver were seen at that gas station. I also observed the Audi there as I passed by.

4. I continued northbound on Portland to where the marked SUV was stopped and because it was apparent that the Audi driver, whom I later learned was the Plaintiff, Mr. Johnson, was watching us, we decided to move out of his view and my Sgt., Jeremy Robinson, continued keeping him under observation using the BLC at the intersection.

5. Sgt. Robinson advised that the Audi was leaving the gas station and was turning left/eastbound onto Clifford Avenue. The BLC footage shows him exiting at 9:44:56 and cutting off a westbound car as he did so, though there was no eastbound traffic at that point. It also shows a white car travelling a distance behind the Audi and me in my marked car travelling short distance behind the white car.

6. The Audi turned right onto Miller Street to proceed southbound and I turned right onto Miller a few seconds behind it. A BLC mounted on the north side of Clifford Avenue across from the intersection with Miller Street captured the events that occurred from the point where we turned onto Miller. The footage shows the brake lights on the Audi flaring just as I was beginning to turn and it shows them going on and off intermittently as we proceeded southbound on Miller. It also shows the Audi going much slower than the speed limit and my car closing the distance between us fairly quickly.

7. Miller Street is one-way southbound from Clifford and cars usually park along the right/west curb, though that is not specifically designated for parking. From the time we turned

2

onto Miller Street, the actions of the Audi driver appeared quite suspicious—as though the driver were looking for someplace to stop and flee. I observed the Audi beginning to drift to the right, out of the travel lane, without signaling and I activated my emergency lights to pull it over. I understand now that the driver, Mr. Johnson, who was placed in the rear seat of my fellow Officer, Brandon Glodowski's marked car following arrest and for transport to the Clinton Section Office, made comments to him that he was on Miller Street to pick up a neighbor, who had contacted him to ask for a ride home to the apartment building where they both lived. This was captured on Officer Glodowski's body warn camera. In retrospect, some of Mr. Johnson's actions as we moved southbound (again, we were the only two vehicles in traffic on Miller at the time), might have been him looking to the right for his neighbor. I understand that he advised Officer Glodowski that before he knew that a police car was following him, he was looking for his neighbor and was "pulling to the side," which is exactly what I saw just before I activated by emergency lights. The Clifford/Miller BLC shows that there were no vehicles on the left side of Miller, so someone walking on the sidewalk on that side would have visible; whereas, there were cars parked along the right side, which would account for him drifting right if he was looking right to see around those cars.

8. I was stopping the Audi because Mr. Johnson failed to signal out of the travel lane, which is a violation of Vehicle & Traffic Law §1163(d). He need not have fully pulled to the curb without signaling to violate that statute and that provided me with probable cause for the traffic stop. The Clifford/Miller BLC shows that at no time did Mr. Johnson activate his right directional signal, even after my emergency lights went on and he pulled to the right curb.

9. As soon as the Audi stopped, and before I could put my car in park, Mr. Johnson got out of the Audi and began running diagonally southbound toward the east side of Miller

3

Street and toward the next intersecting street to the south, Wright Terrace. As soon as I stopped and put my car in park, I got out and began a foot pursuit of Mr. Johnson.

10. I understand that there is an allegation in his Amended Complaint that I drew my gun and ordered him out of the Audi at gunpoint. That is patently untrue. I never had time to do that because he began running as soon as he stopped. In fact, it is my understanding that he advised Officer Glodowski that he got out and began running as soon as he stopped his car because he was on parole, was out after his curfew, and did not want to risk a parole violation.

11. Further, it would have violated RPD policy had I ordered him out of the car before other Officers arrived. I activated my emergency lights and stopped behind Mr. Johnson's vehicle to keep him in the car until I had back-up because I didn't know then whether he was alone in the vehicle, or whether he was armed. So, if Mr. Johnson had not gotten out and ran as soon as he stopped, I would have remained in my car and ordered him to remain in his until back-up arrived.

12. As I was chasing Mr. Johnson, I observed that he ran out of his sneakers as he exited his vehicle, which were left in the middle of Miller Street on the diagonal path of travel he took. He cut between two houses at 66 and 64 Miller Street and I followed him over a stockade fence and through dense vegetation in the yards behind the houses on Miller and behind the houses on the next street south, Wright Terrace.

13. Just after I exited my vehicle and began chasing Mr. Johnson, I caught in my peripheral vision the marked SUV and two of the Officers who were in it joining in the foot chase, one of whom was Officer Perelli. As I pursued Mr. Johnson, I radioed our progress. I lost sight of him for a few seconds and I ran out onto Wright Terrace and saw him running westbound toward Miller.

4

14.     I caught up with Mr. Johnson fairly quickly on the sidewalk in front of 13 Wright Terrace and ordered him to stop running and to get down onto the ground. He appeared to initially comply, getting down into a push-up position, but then got up and began running westbound again. Before he reached the next driveway, however, I was able to catch him and bring him to the ground. He and I were alone at that time and the details of my apprehension of him are included in the Subject Resistance Report I completed, a copy of which is attached as Exhibit A. My Investigative Action Report is attached as Exhibit B and provides additional details of my involvement in Mr. Johnson's surveillance and apprehension.

15.     It took almost no effort at all to bring Mr. Johnson to the ground and under control, as he appeared physically exhausted from the foot chase. As I was on top of him and ordering him to bring his hands behind his back, Officer Perelli came up from behind us, running westbound on Wright Terrace, and he affixed his handcuffs to Mr. Johnson's wrists.

16.     Mr. Johnson complained of having difficulty breathing while we were on the ground after he was handcuffed, and asked to be moved to his side. I did that and he thanked me. I then brought him to a sitting position and shortly thereafter, Officer Jose Rodriguez pulled up near us on Wright Terrace in the marked SUV, got out and assisted me in bringing Mr. Johnson to his feet. Officer Glodowski had also brought his marked car onto Wright Terrace and Officer Rodriguez and I walked him to Officer Glodowski's car to place him in it to wait the investigation at the scene and transport to the Clinton Section Office for an interview. This is captured on Officer Rodriguez's BWC footage. I also was wearing a BWC, but in the haste to get out of my car and pursue Mr. Johnson, I apparently did not hit the button hard enough to activate it, which I learned later, as it fell off at some point during the chase and was later located.

17. Once Mr. Johnson's custody was transferred to Officer Glodowski, I had no further involvement in the events of that evening, except for completing the paperwork attached hereto as Exhibits A and B. I was not involved in Mr. Johnson's subsequent criminal prosecution, other than to provide testimony at a grand jury proceeding and in a Mapp Hearing before State Supreme Court Justice, Charles Schiano, Jr.

18. I testified at the Mapp Hearing about what occurred as I followed Mr. Johnson on Clifford and after turning onto Miller and about why I stopped him. As I state above, I observed him braking intermittently, slowing significantly, and drifting to the right toward the west curb without signaling, at which point I activated my emergency lights and effected a traffic stop. It is my understand that Justice Schiano observed the Clifford/Miller BLC footage and believed that I activated my emergency lights before Mr. Johnson pulled over. That camera did not capture the same line of sight that I had and, moreover, the V&TL §1163(d) offense did not require that Mr. Johnson actually pull completely to the curb without signaling. Drifting from the travel lane was the statutory offense and is what I observed. I am aware that it is alleged that I fabricated those statements and that is categorically untrue. What I saw was the Audi beginning to drift right without signaling, which in retrospect could have been Mr. Johnson looking for his neighbor and looking for a place to stop to text and to try to find him. Drivers often unconsciously drift in the direction they are looking as they are driving.

19. What I observed provided reasonable suspicion or probable cause for the traffic stop and I thus respectfully submit that I am entitled to summary judgment of all the claims and causes of action in this suit. Or, alternatively, even if reasonable police officers could differ about what I observed and did, I submit that this provides arguable probable cause for the traffic stop and would entitle me to qualified immunity and to dismissal of all the claims and causes of

6

action. In either event, I respectfully submit that this Court should dismiss this action as against me in its entirety.

_____
JONATHAN LAUREANO

Sworn to before me
This 6th day of July, 2023.

_____
Notary Public

CHRISTOPHER S. NOONE, ESQ.
Notary Public, State of New York
Monroe County, reg# 4946541
My Commission Expires Feb. 6, 2027

# EXHIBIT A


PSS

2019-1091

| SUBJECT | | | | | | Check if Taser was deployed | | | Page 1 of 2 |
|---|---|---|---|---|---|---|---|---|---|
| 1. LAST NAME  Johnson | | | FIRST NAME  Devin | | | M.I.  S | 2. DATE  8/24/19 | 3. TIME  2147 | 4. CR #  19-202259 |
| 5. DOB  ▇▇▇ | 6. SEX  Male | 7. RACE  Black | 8. HEIGHT  5'11" | 9. WEIGHT  200 | 10. INCIDENT LOCATION  13 Wright Te | | | | BEAT  267 |

**11. ARREST?**  ☐ NO – release approved by:
☒ YES – charges: CPW 2, CPW 3, CPSP 4, OGA 2, RESISITING ARREST

| 12. SUBJECT'S ACTIONS | 13. TACTIC EFFECTIVENESS | | | | | |
|---|---|---|---|---|---|---|
| Subject resisted by (check all that apply and explain in narrative) | Check the appropriate box indicating whether the tactic was used, if the tactic was used write the number (1, 2, 3...) indicating what order the tactics were used in column one (1). In column two (2) write E, for *Effective*, ME, for *Moderately Effective* and NE, for *Not Effective*. | | | | | |
| | | | Order | Effectiveness | | Order | Effectiveness |
| ☒ **Avoiding Custody** (May include: non response, verbal refusal, using body as "dead weight", running/walking away, bracing/tensing body, pulling away, locking arms under body, holding onto a fixed object) | ☒ Verbal  ☐ Mandibular Angle  ☐ Hypoglossal Nerve  ☐ Jugular Notch  ☐ Clavical Notch  ☐ Brachial Stun  ☐ Suprascapular Stun  ☐ Jab  ☐ Front Kick  ☐ Straight Punch  ☐ Angle Kick  ☐ Forearm Strike  ☐ Knee Strike  ☐ Spear  ☐ Hooking Technique  ☒ Ground Stabilization (ie. 3-Point Landing, joint manipulation) | 1  3 | NE  E | ☐ Bi-Lateral Compression  ☐ Arm Lock w/Baton  ☐ Front Jab w/Baton  ☐ Rear Jab w/ Baton  ☐ Forward Strike  ☐ Middle Strike  ☐ Reverse Strike  ☐ Strong Side Horizontal Strike  ☐ Support Side Horizontal Strike  ☐ OC  ☐ Taser  ☐ Bean Bag  ☐ Hand Gun  ☐ Long Gun  ☒ Other: See Narrative  ☐ Other: | 2 | E |
| ☐ **Assaultive** (May include: fighting stance, combative approach, punching, kicking, biting, tackling) | | | | | | |
| ☐ **Imminent Threat of Deadly Physical Force/Serious Physical Injury (SPI)** (May include: using or threatening to use a firearm/edge weapon/contact weapon in close proximity or while closing the distance/dangerous instrument under circumstances in which it is readily capable of SPI or death. Air/blood choke which creates an imminent risk of SPI or death. Impacts w/o weapon which creates an imminent risk of death or other SPI) | | | | | | |

**14. Narrative** *(If officer is in plainclothes, describe own clothing. If tactic(s) used on subject were ineffective, explain reason(s) why.)*

On the abovae date and time, while working in full uniform, I did stop a suspicious vehicle for NYS VTL violations. The driver, Johnson (S), immediately fled the vehicle on foot and a brief chase ensued. I caught up to (S) on the dead end of Wright Te. (S) was given several commands to stop and get on the ground (1). (S) pretended to comply by getting into a push up position but he didn't allow his chest to touch the ground. As I advanced on (S), he took off running for a second time. I caught up to (S) and performed a tackle (2). I wrapped both of my arms around (S)'s arms/upper body and used my forward momentum, throwing off his balance. We both went to the ground and I ended up on his back. I continued to hold onto (S) until another officer arrived to help me. At that point, I transitioned into a 2-point landing on (S)'s left side (3). While I was in a 2-point landing and maintaining control of (S)'s movemonets, Ofc. P. Perelli handcuffed (S). I assisted (S) to his feet and escorted him to the closest patrol vehicle on Wright Te.

(S) ran out of his shoes during the foot persuit. As a result, (S) sustained a minor cut to his right foot. He was treated on scene by AMR staff. My body camera came off at the beginning of the footchase but it was later recovered in a driveway nearby the intial traffic stop.

| Officer: | ☒ Primary Officer | ☐ Assisting Officer | Name: Ofc. J. Laureano | ID# 2231 |
|---|---|---|---|---|

Page 2 of 2

| 15. Name | ID # | BWC Assigned | BWC Video | Height | Weight | Section | Pltn | Uniform | Injured/ Treated | Cover Page |
|---|---|---|---|---|---|---|---|---|---|---|
| PRIMARY: Ofc. J. Laureano | 2231 | Yes | No | 5'8" | 150 | Clinton | 4th | Yes | No | Yes |
| Ofc. P. Perelli | 2138 | Yes | Yes | 5'7" | 150 | SOD | 4th | Yes | No | No |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

**WITNESSES** – Conduct a neighborhood check and indicate with code: W – Witness/Deposed, NI – Not Interviewed, NO – Interviewed/No Information, WR – Witness/Refused Deposition.

| 16. NAME | ADDRESS | DAY PHONE | EVENING PHONE | WITNESS CODE |
|---|---|---|---|---|
| No Answer | 13 Wright Te. | - | - | NI |
| No Answer | 17 Wright Te. | - | - | NI |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**MEDICAL**  *Attach and forward a copy of all depos to PSS and PDS*

17. Condition of subject: ☒ Sober  ☐ Alcohol Influence  ☐ Intoxicated (alcohol)  ☐ Drugs

18. Subject injured prior to incident: ☒ No  ☐ Yes, describe:

19. Subject injured during incident: ☒ No  ☐ Yes, describe:
* TASER probe penetration or drive stun marks alone are not considered an injury for Box 19.

20. TASER probe penetration: ☒ No  ☐ Yes    TASER drive stun: ☐ No  ☐ Yes

21. If subject was exposed to O.C., was subject treated:  ☐ No  ☐ Yes    ☐ At hospital    ☐ PSB eyewash station

22. Hospitalization: ☒ No – Reason: No injury reported nor observed.
☐ Yes – Transport via  ☐ RPD vehicle #  ☐ Ambulance Co./Veh #  ☐ Other

23. Hospital: N/A                    24. Attending medical professional: N/A

25. Subject: ☐ Admitted  ☐ Treated and Released  ☒ No Treatment  ☐ Refused    26. Time of treatment/refusal:

27. Witness to refusal:

28. Technician work performed: ☐ No – Reason:
☒ Yes by: Ofc. B. Glodowski    ☒ Photos  ☐ Diagram  ☐ Other:
Photos of: ☐ Member(s)    ☒ Subject  ☐ Other:

29. Reports completed: ☒ Crime    ☐ Incident    ☒ Investigative action
(DO NOT ATTACH) ☒ Prisoner data  ☐ Addendum(s)  ☒ Technicians report
☐ Other:    ☐ CR #'s:

30. Commanding Officer at scene: Frank Umbrino    Rank: **Captain**    Section: **Clinton**

**ADMINISTRATIVE REVIEW**

31. Reviewing Supervisor: Sgt. _____ 1848    Date: 9/27/19    Training Requested: ☐ Yes*  ☒ No

32. Section Taser Reviewing Supervisor: _____    Date: _____    Training Requested: ☐ Yes*  ☐ No

33. Platoon Commanding Officer: _____ 1850    Date: 10/6/19    Training Requested: ☐ Yes*  ☒ No

* If training is requested, the Platoon Commanding Officer is responsible to ensure that an Additional Training Report, RPD 1347 is attached for each member that received training.

# EXHIBIT B

| Page 1 of 1 |  | **ROCHESTER POLICE DEPARTMENT**<br>**INVESTIGATIVE ACTION REPORT**<br>**NARRATIVE ONLY** | CR #<br>2019-00202259 |

| | |
|---|---|
| Victim's Name (Last, First, Middle) or Name of Business<br>COR | Location of Offense<br>73 MILLER ST — Beat 267 |
| Date/Time of Occurrence<br>08/24/2019 21:46 | Offense / Charge / Incident (Most Recent Classification)<br>CPW 2, CPW 3, CPSP 4, OGA 2, RESISTING |

**NARRATIVE**

On the above date and time, I responded to the area of Portland Av./Clifford Av. to assist Ofc. P. Perelli with a suspicious vehicle. The vehicle, bearing NYS registration GPB2190, left the area e/b on Clifford Av. I caught up to the vehicle a short distance later on Miller St. The vehicle quickly pulled to the curb in front of 73 Miller St. but failed to signal to the curb. I activated my emergency equipment and stopped the vehicle for the NYS VTL violation.

A male driver exited the vehicle and immediately fled from me on foot s/b down Miller St. I took the male into custody a short distance later in front of 13 Wright Te. The male was later identified to be Johnson (A). (A) was searched and placed in the rear of D37D. I relocated to 73 Miller St. to finish my traffic investigation and speak with the officers who stood by with the suspect vehicle.

I relocated to the 4th floor of the PSB to complete paperwork pertaining to this investigation. I contacted city records to have them run the serial number of the handgun (#BRH4033) that was recovered as a result of this investigation. City records confirmed that the handgun was stolen. MSCO reported the firearm stolen out of Sweeden, NY on 10/25/15.

| Reporting Officer | | IBM # | Date | Reviewed By |
|---|---|---|---|---|
| LAUREANO | JONATHAN | 2231 | 08/25/2019 | BERG, KARL F. |

IAR Narrative Only 2019-00202259 Page 1 OF 1