UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF NEW YORK

---

DEVIN JOHNSON,

                         Plaintiff,

  -v-

The CITY OF ROCHESTER and ROCHESTER
POLICE OFFICER JONATHAN LAUREANO,

                         Defendants.

**DECLARATION**

Civil No. 21-CV-6683(DGL/MWP)

---

STATE OF NEW YORK)
COUNTY OF MONROE) ss.:

**WILLIAM WAGNER**, being first duly sworn, deposes and says as follows:

1. I have been employed as a Police Officer with the City of Rochester's Police Department since 2012 and I make this Declaration in support of the motion for summary judgment made on behalf of my fellow Police Officer, Jonathan Laureano, and on behalf of the City, both of whom are Defendants in this action.

2. I was working on the evening of Saturday, August 24, 2019, I was in full uniform, and was riding in a marked SUV with three other Officers, Jose Rodriguez, who was driving, Philip Perelli and Thomas Lisle, as part of the Tactical Unit. We were on routine patrol in the northeast area of the City.

3. At approximately 9:00 that evening, we were driving on Lincoln Street and observed a black Audi Q7 SUV stopping in front of 5 Lincoln, which is a known gang and drug house and was one of the locations we were monitoring. We observed a black male get out of the vehicle and immediately disassociate himself with it when he saw us, leaving the engine running and the car stereo blaring. He seemed exquisitely uncomfortable upon seeing our

marked SUV and kept us under observation as we drove away. A copy of my Investigative Action Report detailing what occurred is attached hereto as Exhibit A.

4. We later learned that the black male who was driving and got out of the Audi was the Plaintiff in this action, Devin Johnson. Officer Rodriguez made a loop down Bay Street and Goodman to attempt to locate the Audi again and either he or Officer Perelli radioed a general request to the Clinton Section Officers working that evening to assist us in locating it. One of them also asked Sgt. Jeremy Robinson, who was at the Clinton Section Office, to assist us by attempting to locate the Audi on the Blue Light Cameras (BLCs) located in the area.

5. There is a BLC mounted on the light post on the northeast corner of the intersection of Clifford and Portland Avenues and the footage from the evening of August 24, 2019 shows our SUV as it arrived at the intersection, westbound, on Clifford and made a right turn onto Portland, northbound, at 9:31 (I understand that this footage is submitted as an Exhibit to the Rule 56 Statement included in the moving papers). As we passed by the gas station located on that corner, we observed the Audi and the black male we saw earlier, who was getting gas at the pumps closest to Clifford. In fact, the footage shows me and Officer Perelli looking at him and his car as we passed on Portland—I am in the right rear passenger seat and Officer Perelli was in the front passenger seat.

6. As soon as Mr. Johnson saw the SUV, he again disassociated himself from the Audi and kept us in his view. We parked a short distance to the north on Goodman Street and received a radio transmission from Officer Laureano a few minutes later advising that he had passed the gas station and saw the Audi and Mr. Johnson there. Officer Perelli or Officer Rodriguez advised Sgt. Robinson and he turned the BLC toward the gas station to keep the Audi in view, which allowed us to pull the SUV further north on Portland to put it out of Mr.

Johnson's view. Officer Laureano did likewise in his marked car. The BLC's view of the Audi is obscured by the gas station sign, but shows the side of the gas pumps parallel to and closest to Clifford Avenue. The Audi was stopped on the other side of those pumps.

7. Mr. Johnson's reactions to seeing our marked SUV on both occasions appeared to us to be highly suspicious. So, when Sgt. Robinson advised us that the Audi was leaving the gas station and turning left/eastbound on Clifford Avenue, Officer Laureano followed it in his marked car, intending to stop it and identify the driver. The Clifford/Portland BLC shows the Audi leaving the gas station at 9:44:50 and Officer Laureano's marked car following him eastbound on Clifford at 9:45:20, separated by another car. That footage also shows our SUV crossing the gas station's lot and turning left/eastbound on Clifford from 9:45:22 to 9:46:04.

8. The BLC footage shows the Audi arriving at the intersection with Miller Street and turning right/southbound onto Miller at 9:45:22, without activating its right directional signal, followed by Officer Laureano's car at 9:45:29, and our SUV turning right onto Miller at 9:45:45. There is another BLC located on the north side of Clifford across from the intersection with Miller Street and Sgt. Robinson also picked up this activity on that camera at the same times.

9. The Clifford/Miller BLC shows the Audi's brake lights flaring just as the front of Officer Laureano's car enters Miller Street, it shows them activating several more times as the Audi and Officer Laureano's car, which are the only two moving in traffic on Miller Street, proceed southbound, and it shows the Audi slowing considerably and moving slightly to the right as Officer Laureano's car closes the gap between them. Miller Street is, and was in August 2019, one-way southbound from Clifford Avenue and vehicles regularly park along the right, or west curb, but not along the opposite curb. That was true on the evening at issue, as well.

10. Our SUV stopped just behind Officer Laueano's car, which was just behind the Audi and we heard Officer Laureano radio that the driver had exited the Audi as soon as it stopped and that he was pursing the driver on foot. This is what I saw as we closed quickly on Officer Laureano's car. I am aware that it is claimed in Mr. Johnson's Amended Complaint that Officer Laureano ordered him out of the Audi at gunpoint, which is contrary to what I observed and is also contrary to RPD policy. In effecting a traffic stop where is it unknown how many occupants are in a vehicle and whether they are armed, policy prohibits ordering the occupants out. Rather, emergency lights are used to stop the vehicle and keep the occupants inside and, if necessary, an order will be given over the vehicle's PA to remain inside the vehicle. An Officer would not, and Officer Laureano did not, order Mr. Johnson out of the car at gunpoint—Mr. Johnson was out of the Audi and running before Officer Laureano could stop his car and get out.

11. Officers Lisle and Perelli got out of the SUV as soon as it stopped and joined in the foot pursuit of Mr. Johnson. Officer Rodriguez and I remained with the SUV and I got out and stayed with the Audi while Officer Rodriguez maneuvered around Officer Laureno's car and made his way south on Miller to the next intersecting street, Wright Terrace, which is where it appeared Mr. Johnson was running.

12. Mr. Johnson ran diagonally across Miller Street toward the east curb, then ran between the houses at 66 and 64 Miller, eastbound. I lost sight of him, Officer Laureano, and Officers Lisle and Perelli there as they ran eastbound between the houses. I was listening to Officer Laureano's radio transmissions regarding the progress of the foot chase, however, and learned that he eventually emerged onto Wright Terrace between houses. I am aware that Officer Laureano was able to catch up to him and apprehend him there, alone, and that Officer

4

Perelli arrived while they were on the ground and assisted by handcuffing Mr. Johnson with his own handcuffs, based on the radio transmissions I heard.

13. I have learned since the date of his apprehension and arrest that Mr. Johnson was on parole and had an 8:00 p.m. to 8:00 a.m. curfew. He was out after that when we first observed him at 5 Lincoln Street at about 9:00 and when we spotted him again at the gas station at Clifford and Portland at just after 9:30. I have also since learned that he apparently received a text message while at the gas station from a neighbor who was residing in the same apartment building and who had requested a ride home, advising that he was walking somewhere on Miller Street. Additionally, I have learned that Mr. Johnson was placed into the back seat of Officer Brandon Glodowski's marked car and spoke at length with Officer Glodowski about running because he feared revocation of his parole and that he was trying to speak with a supervisor to work out a deal to avoid that virtually from the time he and Officer Glodowski began speaking.

14. Mr. Johnson's desire to avoid parole revocation and his being out past curfew would explain his very suspicious behavior on each occasion when he saw our marked SUV and disassociated himself from the Audi. His agreement to pick up his neighbor would also explain the actions of the Audi, as observed on the Clifford/Miller BLC, which I have seen. His repetitive braking, slowing significantly and his drifting toward the right curb, which occurred just before Officer Laureano activated his emergency lights, appeared consistent with him looking for his neighbor, or stopping to text him to determine where he was. The Clifford/Miller BWC footage shows that there were no parked cars on the left side of Miller, but several on the right and it is possible that Mr. Johnson was trying to look around them to look for his neighbor and many drivers unconsciously drift in the direction they are looking.

15. In any event, Officer Laureano effected a traffic stop for Mr. Johnson's violation of V&TL §1163(d), which, among other things, prohibits changing travel lanes without activating a directional signal. The Clifford/Miller BLC shows that at no time on Miller Street did Mr. Johnson activate a directional signal on the Audi and the traffic offense was complete when he started to drift right and out of the travel lane. Upon observing what is shown on the BLC footage, I would have effected a traffic stop for the same reasons as did Officer Laureano and at the same time he did.

16. In view of all of the foregoing, I join Officer Laureano and the City in their motion for summary judgment and would urge that this Court grant them that relief.

SGT. WILLIAM WAGNER 2334

Sworn to before me
this ___ day of _____ 2023.

_____
Notary Public

CHRISTOPHER S. NOONE, ESQ.
Notary Public, State of New York
Monroe County, reg# 4946541
My Commission Expires Feb. 6, 2027

6

# EXHIBIT A

| Page 1 of 1 |  | **ROCHESTER POLICE DEPARTMENT**<br>**INVESTIGATIVE ACTION REPORT**<br>**NARRATIVE ONLY** | CR #<br>2019-00202259 |
|---|---|---|---|

**DETAIL**

| Victim's Name (Last, First, Middle) or Name of Business | Location of Offense | Beat |
|---|---|---|
| City of Rochester | 73 MILLER ST | 267 |

| Date/Time of Occurrence | Offense / Charge / Incident (Most Recent Classification) |
|---|---|
| 08/24/2019  21:46 | CPW 2nd, CPW 3rd, CPSP 4th |

**NARRATIVE**

On today's date, Tactical officers Jose Rodriguez, Lisle, Perelli and I were on routine patrol in the area of Lincoln St and Merrimac St when we observed the listed vehicle, a 2008 Audi Q7 bearing NY registration GPB2190. The vehicle was pulled to the curb in the area of 5 Lincoln St and a male later identified as (A) got out of the vehicle and began walking towards the house. As we passed by the vehicle, we noticed (A) had left the vehicle running, unattended, with the music on at a very loud volume.

By the time we observed all of this, (A) was out of sight.

A short time later, I observed the vehicle at the gas station at Portland and Clifford. I notified the rest of the guys and we turned up Portland Av. As we did so, I again saw (A), the lone occupant, get out of the vehicle and walk towards the store.

We were able to stop the vehicle with assisting officers as it left the gas station and turned onto Miller St. We were the second vehicle behind (A)'s Audi and I observed him exit the vehicle and flee on foot. He ran out of his shoes, which were left in the middle of Miller St, and continue behind 64 Miller St.

Multiple officers began pursuing (A) so I remained with the Audi that (A) fled from. There were no other occupants in the vehicle. I briefly checked the vehicle for any contrband in plain sight while assisting officers were pursuing (A).

Once he was in custody, Ofc. Lisle returned to the vehicle and searched the vehicle discovering the handgun.

I had no further involvement.

| Reporting Officer | | IBM # | Date | Reviewed By |
|---|---|---|---|---|
| WAGNER | WILLIAM | 2334 | 08/24/2019 | BERG, KARL F. |

IAR Narrative Only 2019-00202259 Page 1 OF 1