# Plaintiff's Exhibit

# A

*Mapp Hearing Testimony*

```
 1  STATE OF NEW YORK      :    SUPREME COURT

 2  COUNTY OF MONROE       :    CRIMINAL TERM

 3  -------------------------------------------x
                                    :   Indictment No.
 4  THE PEOPLE OF THE STATE OF NEW YORK    :   2020-0070
                                    :
 5              - vs -                  :
                                    :   CPW 2
 6                                  :   CPW 3
      DEVIN JOHNSON,                :
 7                        Defendant. :
    ---------------------------------------X   MAPP HEARING
 8
                             Hall of Justice
 9                           99 Exchange Boulevard
                             Rochester, New York 14614
10                           August 25, 2020

11

12  P r e s i d i n g :

13          THE HONORABLE CHARLES A. SCHIANO, JR.
                                 Supreme Court Justice
14

15  A p p e a r a n c e s :
16
            SANDRA DOORLEY, ESQ.
17              Monroe County District Attorney
                BY:  GREGORY CLARK, ESQ.
18              Assistant District Attorney

19          MARK YOUNG, ESQ.
                On Behalf of the Defendant
20

21          Defendant present

22

23

24  R e p o r t e d   B y :     SHAUNA C. CHAMBERS, CSR
                                 Senior Court Reporter
25
```

I N D E X   T O   W I T N E S S E S

                                    DX      CX

For the People:

Officer Jonathan Laureano

        By Mr. Clark            4

        By Mr. Young                    9


Officer Thomas Lisle

        By Mr. Clark            27

        By Mr. Young                    36

                    *           *           *



I N D E X   T O   E X H I B I T S

For the People:                              ID     EVD

 1 - General Order 511, Towing orders         3      32

 2 - Property custody report - Lisle          3      34

 3 - Property custody report - Mueller        3      34

 4 - Tow report                               3      35

 5 - Supporting deposition - Laureano         5      --

                    *           *           *

1      THE COURT:  This is Case No. 2, Devin Johnson.

2      May I have appearance for the People, please?

3      MR. CLARK:  Greg Clark appearing for the

4  People.

5      MR. YOUNG:  Mark Young appearing for

6  Mr. Johnson.  Judge, can we have Mr. Johnson unshackled,

7  please?

8      THE COURT:  Yes.

9      Can you unshackle him for the hearing, please?

10  (The defendant's restraints were removed.)

11  (People's Exhibits 1-4 marked for identification.)

12      THE COURT:  This matter is on for a Mapp

13  hearing.  The People ready to proceed?

14      MR. CLARK:  We are, your Honor.

15      THE COURT:  Mr. Young, ready to proceed?

16      MR. YOUNG:  We are, Judge.

17      THE COURT:  For the record, I do have the grand

18  jury minutes.  I will have, after the hearing, I will

19  have it on for a Huntley hearing decision -- strike

20  that -- a Mapp decision and grand jury review I will have

21  it on for.

22      First witness, please.

23      MR. CLARK:  The People call Officer Jonathan

24  Laureano.

25

1              J O N A T H A N     L A U R E A N O,

2  called herein as a witness, first being duly sworn, testified

3  as follows:

4              COURT DEPUTY:  Please state your name and spell

5       it for the record.

6              THE WITNESS:  Jonathan Laureano.  J-O-N-A-T-H-

7       A-N L-A-U-R-E-A-N-O.

8              THE COURT:  You may ask.

9  DIRECT EXAMINATION BY MR. CLARK:

10      Q    Good morning, Officer.

11      A    Good morning.

12      Q    Please tell the Court where you work, sir.

13      A    City of Rochester.

14      Q    In what capacity?

15      A    Police officer.

16      Q    How long have you worked as a police officer for the

17  City of Rochester?

18      A    Ten years.

19      Q    Now, Officer, I want to direct your attention to on

20  or about August 24th of 2019, around -- let's see, 9:46 p.m.

21  Were you on duty?

22      A    Yes.

23      Q    And what was your assignment that evening?

24      A    I was assigned to directed patrol, northeast area of

25  Rochester, no particular area.

1     Q    And did there come a time when you responded to

2  assist a fellow officer in regards to a particular vehicle?

3     A    Yes.

4     Q    Where did you go?

5     A    I drove by the area of Clifford and Portland, and

6  then hung out just south of that location.

7     Q    And is that location in the city of Rochester,

8  Monroe County, New York State?

9     A    Yes.

10    Q    Was there a particular vehicle that you were looking

11  for around that approximate date, time and place?

12    A    Yes.

13    Q    What kind of vehicle was that?

14    A    It was a black SUV.  As for the specific make and

15  model, I would need to see a document.

16    Q    Would reviewing one of the reports help refresh your

17  recollection?

18    A    It would.

19    (People's Exhibit 5 marked for identification.)

20          MR. CLARK:  May I approach the witness, your

21    Honor?

22          THE COURT:  Sure.

23    Q    Officer, I am going to show you what's been marked

24  as People's Exhibit 5 for identification.  Do you recognize

25  that document?

1    A    Yes.

2    Q    And what is that document?

3    A    This is a supporting deposition that I completed.

4    Q    Did you complete that in connection with this case?

5    A    Yes.

6    Q    Does that help refresh your recollection as to the

7 make and model of the vehicle that we are discussing?

8    A    Yes.

9    Q    And what was that?

10    A    It was a black Audi SUV.

11    Q    So, Officer, where did you first observe the black

12 Audi SUV?

13    A    Parking lot of Portland and Clifford, a gas station

14 on the northeast corner.

15    Q    And did there come a time when you observed the

16 vehicle leave that location?

17    A    Yes.

18    Q    What happened next?

19    A    I proceeded to get behind the vehicle.  We traveled

20 a short distance before turning southbound onto Miller Street.

21 And then the vehicle pulled over to the side of the curb, and

22 it didn't activate its signal before pulling to the side of

23 the curb.  At that time I did activate my emergency equipment

24 and perform a traffic stop.

25    Q    Now, had you turned on your lights or sirens at any

JONATHAN LAUREANO - DIRECT

1  point prior to that time?

2      A    No.

3      Q    The time, the entire time you were following the

4  Audi until you turned on your lights and sirens, were you

5  maintaining an appropriate distance between your car and the

6  Audi?

7      A    I was a significant distance behind it initially,

8  yes.

9      Q    And you said there came a time when you saw the

10 vehicle park at the curb without signaling; is that correct?

11     A    Yes.

12     Q    And then what happened after you observed the

13 vehicle go to the curb without signaling?

14     A    I activate my emergency equipment to perform a

15 traffic stop.

16     Q    And what happened next?

17     A    The driver door opened and a male immediately exited

18 the vehicle and began to run on foot.

19     Q    Was your vehicle still in motion or had you stopped

20 when you saw the driver's door open?

21     A    I was still getting out of the vehicle.  I literally

22 just put it in park and was beginning to exit.

23     Q    Were there any other occupants in the vehicle at

24 that time?

25     A    None that I could see.  But I was focused on the

JONATHAN LAUREANO - DIRECT

1 | driver.

2 |     Q    So then after you saw the driver run from the
3 | vehicle, what did you do?

4 |     A    I pursued the individual.

5 |     Q    And what happened next?

6 |     A    After a short period of time I was able to catch up
7 | to the driver and take him into custody on Wright Terrace.

8 |     Q    Was the person who you took into custody the same
9 | person you saw exit the vehicle right after it stopped?

10 |     A    Yes, it was.

11 |     Q    Did you later learn that person's identity?

12 |     A    Yes, I did.

13 |     Q    What was that person's name?

14 |     A    Devin Johnson.

15 |     Q    Do you see Mr. Johnson in court today?

16 |     A    Yes.

17 |     Q    Could you please point to him and name something he
18 | is wearing?

19 |     A    Mr. Johnson is off to my right in a seated position,
20 | wearing a tan outfit.

21 |         MR. CLARK:  Let the record reflect the witness
22 |     has identified the defendant?

23 |         THE COURT:  It shall.

24 |     Q    Officer, once you took Mr. Johnson into your
25 | custody, did you notify other officers in the area by way of

JONATHAN LAUREANO - DIRECT

1  radio or something like that?

2      A    Yes.

3      Q    Now, while you were involved in the foot chase, did

4  you have your Rochester issued, Rochester Police-issued body

5  worn camera on you?

6      A    Yes, at one point it was.

7      Q    I am sorry?

8      A    At one point it was on me. It did come off.

9      Q    Had you activated the body camera during the course

10  of the pursuit?

11      A    I believe I attempted to, but for whatever reason it

12  did not go on, it did not stay on my person. So, no.

13      Q    All right. And was there any reason that you are

14  aware of why there was no video from that foot chase?

15      A    It happened very quickly. In attempting to exit my

16  vehicle and maintain visual of the driver, again, this is a

17  fast-developing incident, I was attempting to activate it. I

18  must not have hit it hard enough, it did not record. But

19  during the pursuit it did come off.

20          MR. CLARK: All right. Thank you. No further

21      questions.

22          THE COURT: Mr. Young?

23  CROSS-EXAMINATION BY MR. YOUNG:

24      Q    Officer Laureano, when you first -- strike that.

25  You were notified by Officer Perelli that he needed

1   assistance?

2       A    Yes.

3       Q    You said it was a suspicious vehicle, correct?

4       A    Yes.

5       Q    What was suspicious about it?

6       A    You have to ask Officer Perelli.

7       Q    I am asking you.  You said in your report that you

8   were asked to help Officer Perelli with a suspicious vehicle?

9       A    Right.

10      Q    Did you ask him?

11      A    I don't ask other people why it's suspicious.

12  That's up to them to determine, because they are going to have

13  to do the report.

14      Q    Is Officer Perelli here today to tell us why?

15      A    I don't know if he is here today.

16      Q    Did you see him?

17      A    Not yet.

18      Q    Is he still on duty?

19      A    I am not sure.

20      Q    You are not sure if he is on duty?

21      A    You are asking me to speak to something I don't

22  know.

23      Q    Okay.  When you first observed the car, where was

24  it?

25      A    It was in the parking lot of the gas station at the

1    corner of Portland and Clifford, on northeast corner.

2         Q    Did you speak with Officer Perelli when you got

3    there?

4         A    No.  He wasn't there.

5         Q    Okay.  How did you know which vehicle you had to

6    follow?

7         A    I was directed by Officer Perelli.

8         Q    Okay.  He wasn't at the location though, he was on

9    the radio?

10        A    We were communicating via radio, yes, sir.

11        Q    But he wasn't at the gas station?

12        A    No, he was not at the gas station.  There is video

13   of that.

14        Q    What exactly did he ask you to do on the radio with

15   regard to this vehicle?

16        A    Just didn't know if it was still at the gas station.

17        Q    All he wanted to know was whether the car was at the

18   gas station?

19        A    Initially, yes.

20        Q    Okay.  He said, Just let me know if it's still at

21   the gas station, and you responded, Yeah, it is.

22        A    Not in exactly that way.  To sum it up, yeah.

23        Q    Well, what else did he ask?

24        A    It was a year ago.  I don't know specifically,

25   exactly what he asked, in chronological order.  He directed my

1  attention to a suspicious vehicle, which I confirmed was still

2  at that location.

3      Q    Okay.  Did he ask you to follow the vehicle?

4      A    He did not specifically ask me, but the closest

5  vehicle that was to that location, if it did leave, if we

6  could get behind it.  Because he had observed it earlier,

7  again, and determined to be a suspicious vehicle, and why, I

8  cannot attest to.

9      Q    Did he ask you to follow it for the reason of

10 pulling it over?

11     A    He doesn't have to ask me.  He wants to ID the

12 driver, it's a known, at some point whoever is closest to the

13 vehicle, whether it's me or another officer, we are going to

14 get behind the vehicle, and if we have enough to stop it, stop

15 it and identify the driver.

16     Q    So your intention was to stop that vehicle at some

17 point in time, correct?

18     A    If I had probable cause to stop the vehicle, then to

19 stop the vehicle and identify the driver.

20     Q    Well, you were waiting for any Vehicle and Traffic

21 violation, according to you, to pull it over, correct?

22     A    If there is probable cause, to stop the vehicle to

23 identify the driver.

24     Q    Well, a Vehicle and Traffic violation would give you

25 probable cause to pull it over, wouldn't it?

JONATHAN LAUREANO - CROSS

1     A    Yeah, that's probable cause.

2     Q    How far did you follow the vehicle before you

3 determined you had probable cause to pull it over?

4     A    Two hundred feet.

5     Q    The vehicle went a few hundred feet before you

6 determined there was a Vehicle and Traffic Law violation and

7 pulled it over?

8     A    Yes.

9     Q    And you said the Vehicle and Traffic violation that

10 you observed was signal, failure to signal, correct?

11     A    That's the Vehicle and Traffic Law observation I

12 observed, yes.

13     Q    Okay.  And in the street, I guess it's Clifford

14 Avenue that you actually stopped the vehicle at?

15     A    No, sir.

16     Q    Miller?

17     A    Yes, sir.

18     Q    Okay.  And Miller Street is a two-way, correct?

19     A    No, sir.  It is a one way.

20     Q    It's one way?

21     A    Yes, sir.

22     Q    Was there cars parked on either side of the street?

23     A    No.

24     Q    There weren't any cars parked on the street at all?

25     A    There were parked on street.  I don't recall either

1  side, I do recall one side.

2      Q    Which side?

3      A    To the right.

4      Q    So the side that my client was pulling over to,

5  there was vehicles parked there already.

6      A    Correct.

7      Q    So the vehicles are allowed to park there, correct?

8      A    Sure.

9      Q    And my client's vehicle at the point that he pulled

10 over was not blocking a driveway or fire hydrant, correct?

11     A    I wasn't pulling him over for his parking.

12     Q    I am asking you --

13     A    I am telling you.

14     Q    Let me ask the question.

15          THE COURT:  Let's answer the question he asked.

16     Q    When he pulled over his vehicle was in a legal

17 parking spot, correct?

18     A    I didn't know specifically how close to a driveway

19 it was.  That would be more of a parking issue, that's not why

20 I was pulling him over.

21     Q    Did you give him a parking ticket?

22     A    It wasn't for parking, sir.

23     Q    Was he parked illegally in the street?

24     A    I did not get a chance to observe how far away from

25 a curb he was, or his proximity to a driveway, or a fire

1  hydrant may be too close to him because of what was evolving

2  during the traffic stop.

3      Q    Was his car blocking the road?

4      A    No, it wasn't blocking the road.

5      Q    Okay.  And you know from being an officer with

6  Rochester Police Department that if the car is illegally

7  parked or blocking the road, that that also gives you a reason

8  to do an inventory search and have it towed, correct?

9      A    Not all parking violations immediately give us

10  enough to tow, for the ones that do, we could do an inventory

11  search.  But again, the reason for the stop not was not

12  because of his parking, that's not what happened, or what I

13  wrote.

14      Q    Let me make it a little easier question.  The car

15  wasn't towed because it was illegally parked, correct?

16      A    I don't know.  I didn't write a parking ticket.  I

17  didn't write, I didn't complete a tow report.

18      Q    You didn't ask for the vehicle to be towed?

19      A    I didn't complete a tow report.

20      Q    I am asking, did you ask that the vehicle be towed?

21      A    I am not sure who asked for the vehicle to be towed,

22  sir.

23      Q    Once again I am asking you, did you, you,

24  yourself --

25      A    I do not recall.

1     Q   I am not done yet.

2           MR. CLARK:  Objection, asked and answered.

3           THE COURT:  Let's get the answer.

4     Q   Did you request that the car be towed?

5     A   I do not recall requesting that the vehicle be

6 towed.

7     Q   Does that mean you didn't?

8           MR. CLARK:  Objection.

9           THE COURT:  Let's move on.  That's

10 argumentative.  He gave his answer.

11    Q   Did you take part at all in the inventory search?

12    A   No.

13    Q   Do you know who did?

14    A   No.

15    Q   Were you there when it was searched?

16    A   No.

17    Q   Where were you?

18    A   I was with Mr. Johnson on Wright Terrace.

19    Q   Okay.  At any point in time did you come back to the

20 vehicle with Mr. Johnson?

21    A   I did.

22    Q   Did you speak to him at all about the vehicle?

23    A   I did not.  He was placed in another vehicle with,

24 another marked patrol car that had a cage.

25    Q   Safe to say that you didn't tell him why he was

1  being stopped, correct?

2       A    I didn't have a chance to tell him.  He ran away

3  from me.

4       Q    Well, you caught up to him.

5       A    Okay.

6       Q    Put him under, at least put handcuffs on him,

7  correct?

8       A    Yeah, I did.

9       Q    Then you walked him back to where the car was,

10 correct?

11      A    I was collecting myself, and other officer assisted

12 escorting him to another vehicle.

13      Q    So you didn't walk back with him to the vehicle?

14      A    No, I was still collecting myself.

15      Q    You stayed where you initially caught Mr. Johnson

16 and someone else escorted Mr. Johnson back to the car?

17      A    Yes.  We still needed to do work where we took him

18 into custody.

19      Q    Do you know who escorted Mr. Johnson back to the

20 car?

21      A    I do not recall the specific officer who placed him

22 in the backseat the vehicle, but it was on Wright Terrace.

23      Q    Do you recall any officers that were at the scene?

24      A    Sure, I recall officers that were there for

25 responding; tasks assigned to them I do not know.

1    Q    What officers were present at the scene?

2    A    Myself, Officer Phil Perelli, Officer Thomas Lisle,

3 Officer William Wagner, I believe Officer Jose Rodriguez, and

4 officers were coming that were responding to us on that

5 street.

6    Q    Okay.  And what time did Officer Perelli join you?

7    A    On Wright Terrace.

8    Q    Okay.  Was it before you got out of your car to

9 chase Mr. Johnson?

10   A    No.  It was kind of like during the chase.  He was a

11 short distance behind me.

12   Q    So he was also chasing Mr. Johnson, correct?

13   A    We were both in pursuit of Mr. Johnson at that

14 point.

15   Q    Do you recall when Officer Perelli -- strike that.

16 Did Officer Perelli meet up with you, when you got out of your

17 car to chase Mr. Johnson, was he right behind you?

18   A    At some point he got behind me.  I don't know when

19 this was, when I turned around I could hear a vehicle behind

20 me, I kind of took a glance, and I could see another RPD

21 marked vehicle.  I could see Officer Perelli running.  He

22 wasn't the only one, he was the one closest to me that I

23 noted.

24   Q    So in order of the cars that were there, my client's

25 car, was your car behind my client's car?

 1      A    I was behind his car.

 2      Q    You were the second car in line.  That would make

 3  sense that Officer Perelli was the third car in line, correct?

 4      A    I believe so.  I don't know.  I didn't see anyone

 5  pulling up directly behind me.  By the time I was sort of, you

 6  know, going down Miller Street, kind of towards the sidewalk

 7  area as we were running into a yard, I kind of looked behind

 8  me and I saw it.  I don't know what number or order he was in.

 9      Q    Now, when you first were contacted, I assume you

10  were contacted by Officer Perelli, correct, by radio?

11      A    No.  Again, he was -- you are talking about during

12  the pursuit?

13      Q    Let me back up.  When you initially got the call to

14  help Officer Perelli with a suspicious vehicle, were you

15  contacted by him directly via radio?

16      A    It was over the radio.

17      Q    Okay.  And do you recall what he said to you?

18      A    I don't recall specifically what he said.

19      Q    Generally, tell me.

20      A    If there was anyone in the area that could confirm

21  if a vehicle was still in the parking lot.

22      Q    That's it?

23      A    Again, generally, that's what was put out.  And it

24  wasn't specific to me, just to any area cars that were in that

25  area.

1    Q    And then you responded back that the car was still

2  at the gas station, correct?

3    A    Yeah.

4    Q    Then what did Officer Perelli say?

5    A    I don't recall.  That was a year ago.  I don't

6  recall, again, in what order and what was said.  You know,

7  that's --

8    Q    Okay.  Well --

9    A    There have been a lot of transmissions that happened

10  between then and now.

11    Q    He had to say something to you in order for you to

12  follow the vehicle, correct?

13    A    I believe, I believe it was something about that he

14  had seen it earlier.  Again, I don't know.  That was a year

15  ago.  And there have been many, many transmissions and jobs

16  and arrests that have taken place and transpired between that

17  time and today.  I mean, it's almost a year ago to the day.

18    Q    Okay.  Well, I am asking you --

19    A    Again, sir, I am trying to tell you, I don't recall.

20  You can ask it --

21    Q    -- what was the reason you were following the

22  vehicle?

23              MR. CLARK:  Objection.

24              THE COURT:  He's asked answered that about

25        three times.

1    MR. YOUNG:  If I got an answer it would be

2    okay, but I didn't.

3    THE COURT:  You got what you got.

4    A    I don't know how else to answer, sir.

5    Q    And according to you, you followed the vehicle about

6    200 feet before you pulled it over?

7    A    I didn't measure the distance.  I would say roughly

8    maybe, I don't know, about 300 feet, give or take.

9    Q    Okay.  And at that point in time, when my client got

10   back in the driver's seat, did you see him get back in the

11   driver's seat?

12   A    No, I didn't specifically see him get into the

13   driver's seat because of where I was parked, just observed

14   that the vehicle was still there.

15   Q    Okay.

16   A    So it wasn't, the angle wasn't quite there.

17   Q    Prior to you catching up to my client, did you get a

18   good look at him when he was driving the car?

19   A    I was behind him, so I couldn't really look at him.

20   Q    Okay.  And how far were you from him when he got out

21   of the car and you stopped your car?

22   A    So when I pulled up behind him, I must have been, I

23   don't know, maybe anywhere between 25, 35 feet, something like

24   that.  There wasn't a terribly long distance.

25   Q    Okay.  I assume it was dark?

1    A    It was dark because it was night time.  Miller

2 Street is a well-lit street, it's got light poles and lamps,

3 all that.

4    Q    Was the light poles on the right side or left side

5 of the street?

6    A    I could not tell you, it was too long ago to tell.

7    Q    Have you been down that street since?

8    A    Sure, I have been down the street.  If you are

9 talking about exactly where he was parked for the stop, there

10 was store camera footage and blue light camera footage.  I am

11 sure there is something that could give you a better visual

12 image.

13    Q    Did you prepare for this hearing at all today?

14    A    I can't prepare for questions I don't know that are

15 going to be asked.  Yeah, I did prepare.

16    Q    How did you prepare?

17    A    By looking over basic documents that I completed.

18    Q    Just the AIRs that you completed?

19    A    I believe I completed a deposition as well, sir.

20    Q    Did you look over anybody else's AIRs and

21 depositions?

22    A    I don't read other people's reports.

23    Q    Did you testify in the grand jury in this case?

24    A    I did testify in the grand jury.

25    Q    Did you go over the grand jury testimony?

1    A    Briefly.

2    Q    You said briefly.  You just glanced at it?

3    A    I skimmed through it, sir.

4    Q    Did you testify in grand jury that the vehicle came

5 to a complete stop on the side of Miller Street?

6    A    If that's in the grand jury testimony, sir, then I

7 testified to that.

8    Q    Was this question asked and did you give this

9 answer?  Page nine, line 13.  Question, So what happened when

10 the vehicle stopped?  Answer, The vehicle came to a stop and

11 as soon as the vehicle was parked the driver door opened and

12 the driver exited the vehicle and began to flee on foot.

13    Was that question asked and that was your answer?

14    A    I did testify in grand jury.  If that question is on

15 line 13 of page whatever, I did answer that.

16         MR. CLARK:  Objection, move to strike.  There

17    is no foundation to impeach him with that.  It's not

18    inconsistent with anything he said so far.

19         THE COURT:  I kind of agree.  You got to set it

20    up differently.  I will agree with that.

21         MR. YOUNG:  Judge, I believe he said he did not

22    recall what he said.  I am asking if he said that.

23         THE COURT:  You need more foundation before you

24    cross him on that.

25    Q    The vehicle came to a stop, correct?

1  A  At some point the vehicle did stop.

2  Q  On the side of Miller Street, correct?

3  A  Yes, sir, on the right side.

4  Q  And you said there was a Vehicle and Traffic Law

5 violation of failure to signal so you activated your lights,

6 right?

7  A  Yes, sir.

8  Q  How close was your car to the vehicle when it

9 stopped?

10  A  When it tame to a stop I would say between maybe 25,

11 35, maybe 40 feet.  It wasn't a significant distance, it was

12 pretty close.

13  Q  Then the driver door opened.  Your car was parked

14 behind the Audi, correct?

15  A  I was coming to position at that point, as I was

16 putting it in park.

17  Q  Okay.  And when the driver door opened you saw a man

18 flee the car, correct?

19  A  Yes, sir.

20  Q  Did you get a good look at the guy who fled the car?

21  A  I got a pretty good look at the guy who fled the car

22 at that point because, again, I was about 25, 35 feet behind

23 him.  He was at that point completely out of the vehicle.  I

24 was getting out of my vehicle, looking at him beginning to run

25 from the vehicle.  So it was a pretty good look.

1    Q    You didn't describe the person in your AIR, correct?

2    A    I don't have to describe that person.

3    Q    My question was, you didn't describe the person, did

4    you?

5    A    No.  Nor did I have to describe the person.

6    Q    Thank you for the extra.  ·

7    A    Thank you, sir.

8    Q    Now, at any time when you were chasing Mr. Johnson,

9    did you lose sight of him?

10    A    I did.

11    Q    How long did you lose sight of him for?

12    A    I would say for a period of maybe 20 to 30 seconds.

13    It was very overgrown vegetation in the yards that we were

14    running through.

15    Q    Did you see him throw anything?

16    A    No, but we canvassed the area afterwards.

17    Q    You said -- did you call for a nitrate dog?

18    A    I don't remember if a supervisor or another officer

19    on scene requested a nitrate canine.  I guess I would have to

20    listen to the radio transmissions that night to confirm if one

21    was requested.  It was common practice that we do so for foot

22    chases because we are, if we do lose sight of individuals we

23    don't know if there is discarded property that could be of

24    evidentiary value.

25    Q    After you caught Mr. Johnson and returned to your

THOMAS LISLE - DIRECT

1    vehicle, did you have, take any other part in the

2    investigation in this case?

3       A    Outside of completing the paperwork, from my part,

4    no.

5       Q    Now, the Vehicle and Traffic Law that you wrote

6    Mr. Johnson for, Section 1163, do you recall what that says?

7       A    Verbatim, I do not.  I believe it was subsection, it

8    was 1163(c).

9       Q    Correct.

10      A    Yes, sir.

11      Q    In your own words, what did Mr. Johnson do to have

12    you write that ticket?

13      A    The violation that I had stopped him for was for

14    when he pulled to the side of the curb, he was in a lane of

15    traffic, did not signal to the curb.  So for that violation,

16    he was stopped.  It's no different than if somebody is parked

17    and fails to signal from the curb.

18               MR. YOUNG:  Okay.  Thank you.

19               THE COURT:  Any redirect?

20               MR. CLARK:  No thank you.

21               THE COURT:  Officer, have a good day.

22        (The witness was excused.)

23               THE COURT:  Next witness?

24               MR. CLARK:  Officer Thomas Lisle.

25

1              T H O M A S   L I S L E,

2  called herein as a witness, first being duly sworn, testified

3  as follows:

4              COURT DEPUTY:  Please state your name and spell

5      it for the record.

6              THE WITNESS:  It's Police Officer Thomas Lisle.

7      T-H-O-M-A-S, first name.  L-I-S-L-E, last name.

8              THE COURT:  You may ask.

9  DIRECT EXAMINATION BY MR. CLARK:

10     Q     Good morning, Officer.

11     A     Good morning.

12     Q     Where do you work, Officer?

13     A     With the City of Rochester Police Department.

14     Q     In what capacity?

15     A     As a police officer.

16     Q     How long have you worked as a police officer?

17     A     For ten years.

18     Q     Now, Officer, I want to direct your attention to on

19 or about August 24th, 2019, around 9:46 p.m.  Did you respond

20 to assist some fellow officers in regards to a traffic stop?

21     A     Yes.

22     Q     Where did you go?

23     A     73 Miller Street.

24     Q     And is that location in the city of Rochester,

25 Monroe County, New York State?

THOMAS LISLE - DIRECT

1    A    Yes.

2    Q    What information did you receive from your fellow

3 officers that led you to that location?

4    A    Officers made a traffic stop and the driver was

5 running from the vehicle.

6    Q    So what did you first observe when you got to 73

7 Miller Street?

8    A    Male running down the middle of the road, and

9 Officer Laureano chasing him.

10    Q    About how far away from you were this male and

11 Officer Laureano when you first arrived?

12    A    Probably when we first pulled up to the stop, maybe

13 25, 50 feet.

14    Q    What did you do when you made those observations?

15    A    I got out, once my vehicle stops, and run eastbound.

16    Q    So were you assisting, then, in the foot pursuit?

17    A    Yes.

18    Q    What, if anything, happened in regards to your

19 assistance in the foot pursuit?

20    A    When I got to the edge of the yard I was in, it

21 appeared that I couldn't see the driver anymore.  I came back

22 out to Miller Street.

23    Q    And what did you do after you lost sight of the

24 driver then?

25    A    I came back out to the car that he fled from.

THOMAS LISLE - DIRECT

1    Q    So you returned back to the vehicle?

2    A    Yes.

3    Q    Do you recall what kind of vehicle that was?

4    A    It was a black Audi Q7.

5    Q    This is an SUV or sedan or something else?

6    A    It's an SUV.

7    Q   And did there come a time you learned that the

8  driver of the vehicle had been taken into custody by your

9  fellow officers?

10    A    Yes, I heard over the radio.

11    Q   So after you learned that the driver had been taken

12  into custody, did there come a time when yourself and your,

13  some fellow officers conducted an inventory search of the car?

14    A    Yes.

15    Q    What were you doing the inventory search for?

16    A    For safekeeping.

17    Q    What do you mean?

18    A    Well, at that point the driver was being arrested,

19  the vehicle had a window down and was in the roadway.

20    Q    Now, you said the window was down, correct?

21    A    Yes.

22    Q    Which window?

23    A    The driver's window.

24    Q    Do you know where the keys were to the vehicle?

25    A    No.  There was a, one key fob was in the glove box.

1     Q    All right.  And that location, Miller Street there,

2  is that a high crime area?

3     A    Yes.

4     Q    Could you go into a little more detail about that?

5     A    Respond to that area for multiple reports of

6  shootings and drug dealing at the corner, there and the corner

7  of Clifford and Miller.

8     Q    So were you concerned about the vehicle being left

9  there with the window open --

10           MR. YOUNG:  Objection.

11           THE COURT:  Let him finish.

12           MR. YOUNG:  Leading question.

13           THE COURT:  Overruled.  You can ask that

14     question.

15     Q    Due to the nature of the area, as well as the fact

16  that the window was open, the key fob was in the vehicle, did

17  you have any concerns about leaving it there?

18     A    Yes.

19     Q    What were your concerns?

20     A    Concerned that someone would be able to get in the

21  car and steal anything from the car, or take the car itself.

22     Q    Did you then conduct an inventory search of the

23  vehicle?

24     A    Yes.

25     Q    And does the Rochester Police Department have rules

1 and regulations about when you can conduct inventory searches

2 and how you conduct them and so on?

3     A    Yes.

4     Q    Is there a general order specific to tow search?

5     A    Yes.

6     Q    Do you recall what that order is?

7     A    I don't know the numerical on it, but there is a

8 general order.

9           MR. CLARK:  May I approach the witness, your

10     Honor?

11           THE COURT:  You may.

12     Q    Officer, I am going to show you what's been marked

13 as People's Exhibit 1 for identification.  Do you recognize

14 that document?

15     A    Yes.

16     Q    And what is that?

17     A    That's a general order for towing vehicles, General

18 Order 511.

19     Q    So was that order in effect at the time of this

20 investigation on August 24th, 2019?

21     A    Yes.

22     Q    And are you familiar with the contents of that

23 general order?

24     A    Yes.

25     Q    And does that basically lay out when you are allowed

THOMAS LISLE - DIRECT

1    to tow a vehicle?

2        A    Yes, it does.

3        Q    Does it also lay out how you conduct a search

4    incident to a tow?

5        A    Yes.

6                MR. CLARK:   The People move Exhibit 1 into

7            evidence.

8                MR. YOUNG:   No objection.

9                THE COURT:   Mark it received.

10       (People's Exhibit 1 received in evidence.)

11       Q    So to the best of your ability, Officer, did you

12   follow the rules as laid out in People's Exhibit Number 1?

13       A    Yes.

14       Q    And what, if anything, did you find during the

15   course of your search?

16       A    I found the key fob in the glove box, and then,

17   under the passenger seat, I found a silver revolver.

18       Q    Now, are you required to write a list of items that

19   were found during the course of inventory search?

20       A    Yes.

21       Q    Did you do that?

22       A    Yes, I filled out a property sheet with items

23   recovered.

24       Q    And is that one of the rules that's laid out in

25   People's Exhibit 1?

THOMAS LISLE - DIRECT

1    A    Yes.

2    Q    Officer, I want to show you, now, People's Exhibits

3  2 and 3 for identification.  Do you recognize those two

4  exhibits?

5    A    Yes.

6    Q    What are Exhibits 2 and 3?

7    A    Two is my property sheet, which has two items that

8  were removed from the car, a washcloth and a key fob for an

9  Audi.  And No. 3 is for Tech Mueller, which is the handgun

10  that was recovered from the vehicle.

11    Q    All right.  And your exhibit, People's 2, does that

12  also reference some shoes?

13    A    Yes.

14    Q    Where were the shoes found?

15    A    Those were in the middle of the road.

16    Q    All right.  So were those documents both filled out

17  in connection with the directives laid out in People's

18  Exhibit 1?

19    A    Yes.

20    Q    And People's Exhibit 2, is that a fair and accurate

21  copy of the property sheet you filled out?

22    A    Yes.

23    Q    Does there appear to be any additions, deletions or

24  changes to it, with the exception of the court exhibit

25  sticker?

THOMAS LISLE - DIRECT

1    A    No.

2    Q    And had you also previously had the opportunity to

3    observe People's Exhibit 3 for identification, the property

4    sheet for the firearm?

5    A    Yes.

6    Q    Does that also appear to be in substantially the

7    same condition as when you last saw it?

8    A    Yes.

9    Q    Any changes, additions or deletions to that

10   document?

11   A    No.

12            MR. CLARK:  The People move Exhibits 2 and 3

13       into evidence.

14            MR. YOUNG:  No objection.

15            THE COURT:  Mark them received.

16   (People's Exhibits 2 and 3 received in evidence.)

17   Q    All right, Officer.  I also want to show you

18   People's Exhibit 4 for identification.  Do you recognize that

19   exhibit?

20   A    Yes.

21   Q    What is People's Exhibit 4?

22   A    This is the tow report that was completed by Officer

23   Rodriguez.

24   Q    Have you also seen that document before today?

25   A    Yes, I have.

THOMAS LISLE - DIRECT

1     Q    And was that document prepared in connection with

2  this case?

3     A    Yes.

4     Q    And is that also required to be filled out pursuant

5  to People's Exhibit 1, the general order?

6     A    Yes.

7     Q    Does that exhibit appear to be in substantially the

8  same condition as when you last saw it?

9     A    Yes, it does.

10     Q    Is it a fair and accurate copy of the original?

11     A    Yes.

12     Q    And does there appear to be any additions, deletions

13  or changes to that document?

14     A    No.

15           MR. CLARK:  People move Exhibit 4 into

16     evidence.

17           THE COURT:  Mr. Young?

18           MR. YOUNG:  No objection.

19           THE COURT:  Mark it received.

20    (People's Exhibit 4 received in evidence.)

21     Q    And then, just once again, Officer, you indicated at

22  some point you did locate a firearm in the vehicle?

23     A    Yes.

24     Q    Where was the gun?

25     A    It was underneath the front passenger seat, in a

THOMAS LISLE - DIRECT

1   drawer that goes underneath the seat.

2       Q    And was it wrapped in anything?

3       A    There was a washcloth over top of it.

4       Q    Did you observe if the firearm was loaded?

5       A    Yes, when the technician unloaded it.

6       Q    Then after you found the gun, did you move it or

7   manipulate it in any fashion?

8       A    No.

9       Q    Was there a technician called to come and collect

10  the firearm?

11      A    Yes.

12      Q    And did anyone move or interfere with the firearm

13  until it was collected by the technician?

14      A    No.

15              MR. CLARK:   I have no further questions for

16      Officer Lisle.   Thank you.

17              THE COURT:   Thank you.

18              Mr. Young, cross?

19  CROSS-EXAMINATION BY MR. YOUNG:

20      Q    Good morning, Officer Lisle.

21      A    Good morning.

22      Q    Couple follow-up questions.   Now, you took no part

23  in the stop of this vehicle, correct?

24      A    No.

25      Q    And at some point in time you started chasing and

1  gave up and went back to the vehicle, correct?

2      A    Yes.

3      Q    Do you remember who was watching the vehicle at the

4  time you showed up?

5      A    Officer William Wagner.

6      Q    Was he sitting is the vehicle, was he standing by

7  the vehicle?

8      A    He was standing next to it.

9      Q    Okay.  And you first looked into the vehicle to see

10  if there was anything in plain view, correct?

11     A    Yes.

12     Q    And you didn't see anything in plain view, correct?

13     A    No.

14     Q    At some point in time you said then you decided to

15  do an inventory search, correct?

16     A    Yes.

17     Q    When was that?

18     A    Shortly after, maybe a couple minutes.

19     Q    After you arrived back at the car?

20     A    Yes.

21     Q    So, at that point in time Devin Johnson was still

22  somewhere, correct?

23     A    He was in custody at that time.

24     Q    Who said he was in custody?

25     A    I heard over the radio, when I got back to the car,

1 that he was in custody.

2 Q Okay. And you said he was, I think you said he was

3 under arrest?

4 A Yes.

5 Q What has he under arrest for?

6 A At that point whatever traffic infraction they had,

7 and then OGA.

8 Q So he was being placed under arrest for OGA and the

9 traffic infraction, which you don't know which was.

10 A No.

11 Q Okay. Did you call for a tow of the vehicle?

12 A Not initially, no.

13 Q Do you know who did?

14 A I don't recall who actually called over the air for

15 one.

16 Q The call for the tow took place after you found the

17 gun, correct?

18 A Yes.

19 Q Okay. Now, when you saw the car, did you check the

20 registration?

21 A Not initially, no.

22 Q Okay. So you didn't know whose car it was, correct?

23 A No.

24 Q You had a valid registration, correct?

25 A Eventually, once I checked it, yes.

1    Q    Okay. And you called the plates in to see if there

2  was a want or stolen vehicle?

3    A    Yes, I added them to the job card.

4    Q    And it wasn't a stolen vehicle, correct?

5    A    No.

6    Q    And the car, it was parked against the curb?

7    A    Yes.

8    Q    So it wasn't blocking traffic, correct?

9    A    No.

10    Q    It wasn't blocking a driveway, correct?

11    A    No.

12    Q    You said the window was down, the driver's window?

13    A    Yes.

14    Q    How far was it down, all the way?

15    A    I would say I think halfway.

16    Q    Okay. And you located the key fob in the car,

17  correct?

18    A    Yes.

19    Q    The key fob was to that car, correct?

20    A    I believe so, yes.

21    Q    And so you were able to, if you wanted to, to roll

22  the window up, correct?

23    A    Yes.

24    Q    Now, safe to say by your AIR that you conducted the

25  inventory search shortly after returning to the vehicle,

1    correct?

2       A    Yes.

3       Q    Do you recall how long after you heard that

4    Mr. Johnson was taken into custody that you started the

5    inventory search?

6       A    Couple minutes.

7       Q    Okay.  People's 1, the general order, under what

8    section, specifically, were you conducting the search?

9       A    I would have to actually look at the general order.

10      Q    Showing you People's 1 that's in evidence.

11      A    (Reviewing exhibit.)

12    So it's Section II, sub C, sub 10.

13      Q    Section II, sub C, sub 10.  C is vehicles may be

14    towed if on a public property, and sub 10 says, in situations

15    incidental to arrest the vehicles will only be towed if they

16    are illegally parked -- which this car wasn't, correct?

17      A    No.

18      Q    Blocking, which this car wasn't, correct?

19      A    No.

20      Q    Hazardous.  It wasn't hazardous, correct?

21      A    No.

22      Q    For safekeeping.  Was it being towed for

23    safekeeping?

24      A    Yes, yes, it was for that.

25      Q    Is that the only reason it was being towed?

1    A    Yes.

2    Q    And the safekeeping was because the window was down,

3    correct?

4    A    Yes.

5    Q    That's it.

6    A    That was it, yes.

7    Q    It also goes on, sub 10, when deciding whether to

8    tow a vehicle for safekeeping, members will take into

9    consideration such factors as the crime rate in the area --

10   which you already testified was high, correct?

11   A    Correct.

12   Q    Proximity of the operator/owner's residence.  You

13   didn't know who the owner was, correct?

14   A    No, not at the time.

15   Q    So you didn't know if the owner lived in the house

16   it was parked in front of, correct?

17   A    No.

18   Q    Okay.  Valuables in the vehicle.  You didn't see any

19   valuables, did you?

20   A    No.

21   Q    And whether or not another person is readily

22   available who can legally and safely operate the car.  You

23   didn't check to see who the registered owner was, correct?

24   A    No.

25   Q    You didn't ask Mr. Johnson if anybody else could

THOMAS LISLE - CROSS

1    take the car, correct?

2        A    No, I did not.

3        Q    So the only reason, according to you, that you did

4    the inventory search was because you were, it was going to be

5    towed, correct?

6        A    Correct.

7        Q    And you had decided that shortly after he was under

8    arrest, without taking into consideration the rest of the

9    factors, correct?

10       A    Correct.

11       Q    Now, when you found the gun, the gun wasn't visible

12   to naked eye, correct?  You looked in the car, you couldn't

13   see it, correct?

14       A    No.

15       Q    In fact, you said it was under the front passenger

16   seat?

17       A    Yes.

18       Q    You said you pulled the seat all the way to the

19   front and noticed there was a yellow washcloth in a drawer,

20   correct?

21       A    Correct.

22       Q    And you pulled the washcloth off and there was a

23   gun, correct?

24       A    Correct.

25       Q    Without pulling the seat up, could you see the gun?

1   A   No.

2   Q   Could you see the washcloth?

3   A   No.

4   Q   Did you find anything else in the car of substance,

5   besides the gun?

6   A   I eventually found the extra key that was in the

7   glove box, after I find the gun.

8   Q   Okay.  The fob, the key fob?

9   A   Yes.

10  Q   Okay.  And that operated the car?

11  A   I believe so, yes.  It was for an Audi.

12  Q   Did you turn the car on?

13  A   I didn't test it, no.

14  Q   So you are just assuming it went with that car?

15  A   Yes, assume, yes.

16          MR. YOUNG:  One second, please.

17          Thank you, Officer.

18          THE COURT:  Any redirect?

19          MR. CLARK:  Nope.

20          THE COURT:  Have a nice day, sir.

21  (The witness was excused.)

22          THE COURT:  Mr. Clark, witness wise?

23          MR. CLARK:  The People rest, Judge.

24          THE COURT:  All right.  Mr. Young, witnesses

25      for you?

PEOPLE vs. DEVIN THOMAS

1               MR. YOUNG:  Judge, could we approach?

2               THE COURT:  Sure.

3    (Off-the-record discussion at the bench.)

4               THE COURT:  We had a brief conference.

5               Mr. Young?

6               MR. YOUNG:  Judge, if we could have just a

7    brief adjournment, I am going to do a little research on

8    the issue we suggested.  If that turns out to be

9    Mr. Clark's vision of the case, I would say we can rest

10    and go forward.

11               THE COURT:  You want to bring it back on an

12    adjourned date without a hearing set?

13               MR. YOUNG:  Correct.

14               THE COURT:  How long?

15               MR. YOUNG:  If I could have a week, Judge, I

16    should have an answer within that time.

17               THE COURT:  All right.  Mr. Clark, are you with

18    me August 31st?

19               MR. CLARK:  Actually I am out that week, Judge.

20               THE COURT:  We will go the week after.  Are you

21    with me, Mr. Clark, September 9th?

22               MR. CLARK:  Yes.

23               THE COURT:  At what time?

24               MR. CLARK:  I have a pretrial with you at ten

25    on Deshaun Smith.

PEOPLE vs. DEVIN THOMAS

1    THE COURT:  Put this on September 9th at ten

2        o'clock.

3        MR. CLARK:  That's fine.

4        THE COURT:  Good for you, Mr. Young?

5        MR. YOUNG:  Perfect.  Thank you.

6        THE COURT:  September 9th, ten o'clock,

7    Mr. Clark to consider the issue as to whether, Mr. Young

8        to consider the issue whether he wants to try and

9        subpoena Officer Perelli.

10        MR. YOUNG:  Correct.

11        THE COURT:  Or anything else he wants to put

12        forward.

13        I am going to need a copy, I am assuming the

14        lawyers want a copy too.

15        MR. CLARK:  Yes.

16        MR. YOUNG:  Yes please.

17        THE COURT:  September 9th, ten o'clock, for the

18        defense to decide if they are going to put a case on for

19        the hearing.

20        Mr. Johnson, we will see you back here, sir,

21        September 9th at ten o'clock.  Okay sir?

22        THE DEFENDANT:  Okay.  Thank you, your Honor.

23        MR. CLARK:  Your Honor, do you want to keep the

24        exhibits for now?

25        THE COURT:  I do.

**Certified to be a true and accurate transcript.**

*Shauna C. Chambers*

**Shauna C. Chambers, CSR**
**Senior Court Reporter**