1                    PSS #2018-0563

2

3

4          ALLEGATION: Procedure/Force

5          PERSONNEL:  Officer Phillip Perelli

6

7

8          STATEMENT OF: Officer Phillip Perelli

9
            DATE:  July 20, 2018
10
            TIME:  10:05 a.m.
11
            PLACE:  Professional Standards Section
12                  846 South Clinton Avenue
                    Rochester, New York 14620
13

14
            PRESENT: Sergeant John Drew, PSS
15                   Sergeant Laszlo Tordai, PSS
                     Investigator Scott Gould, RPLC
16

17

18

19

20          REPORTED BY:  Emily A. Sallome
                          Police Stenographer
21

22

23

24

25

1    **EXAMINATION BY SERGEANT DREW:**

2    Q.     This is the statement of Officer Phillip Perelli

3    concerning Professional Standards Section case number

4    18-0563.  Today's date is July 20th, 2018, and it's

5    approximately 10:05 a.m.

6           We are located at the Professional Standards

7    Section.  Present is Officer Perelli with his Locust

8    Club representative, Investigator Scott Gould.  Also

9    present are Sergeants Drew and Tordai of the

10   Professional Standards Section, and the Professional

11   Standards Section stenographer.

12          Officer Perelli, prior to beginning this

13   statement, I gave you an advisement form.

14   A.     Yes.

15   Q.     Did you read, understand, and sign that form?

16   A.     Yes.

17   Q.     Thank you.  Your statement today is in regards

18   to a Professional Standards Section investigation where

19   Chief Ciminelli has ordered an internal investigation

20   into the circumstances surrounding the arrest and use of

21   force on Mr. Yahmiek Maddox that occurred on May 25th,

22   2018 at 4:04 p.m. at 121 Wilkins Street.  The related CR

23   for this incident is 18-121340.

24          Officer Perelli, can you tell me what your

25   present assignment is?

```
1    A.      Clinton 4th platoon.

2    Q.      And were you working on May 25th?

3    A.      Yes.

4    Q.      What platoon and car assignment were you working

5    that day?

6    A.      It was a give overtime detail.  I was assigned

7    to 4th platoon, and I believe my car assignment was

8    detail 07.

9    Q.      What hours were you working that give detail?

10   A.      It was 3 in the afternoon until 7 at night.

11   Q.      And did there come a time where you had contact

12   with Mr. Maddox?

13   A.      Yes.

14   Q.      And what time and where did that contact occur?

15   A.      I don't know the exact time, I believe it was

16   quarter to 4, 16:04, so about 4 p.m., and it happened

17   over at the corner of Joseph and Wilkins.

18   Q.      So if you could explain what involved your

19   circumstances involving Mr. Maddox?

20   A.      So through the patrol of the area, we're

21   supposed to be dealing as far as with high crime ares,

22   Joseph and Wilkins is high crime, especially dealing

23   with drugs.  Citizen complaint, Mayor's complaint, as

24   far as drug dealing over there, specifically with

25   heroin.  A lot of overdoses, even a few fatalities with
```

1    overdoses with heroin.

2         So driving through the area, a number of people

3    of out.  I saw an individual holding, what appeared to

4    an empty -- or not empty, holding a container of a

5    liquor bottle.  It appeared to be open, so I informed

6    the other officers.  We spun around, as we're coming up,

7    we see everybody dispersing.

8         The individual that I saw holding the bottle and

9    I saw him like set it on the steps on the Wilkins side

10   step -- side of the corner store.  I indicated to other

11   officers this is the male right here, he would have been

12   walking westbound at that point for him to be stopped.

13        He was stopped, and I went over and retrieved

14   the bottle of liquor, which was a little -- had a little

15   alcohol still in it.

16   Q.    Initially, were you in a marked patrol vehicle

17   or an unmarked?

18   A.    I was in the plain white Impala.

19   Q.    Was it fully equipped with a cage?

20   A.    Yes.

21   Q.    When you initially drove by the location, were

22   -- was the other support vehicle with you?

23   A.    I don't know if they were right behind us, but

24   they might of -- if we were on Joseph, they might have

25   been on the next street over on Remington.  We were

1    trying to stay close in proximity to each other, as far

2    as for stops.

3    Q.      What's the reason or objective of having an

4    unmarked vehicle?

5    A.      So that way people don't recognize us right

6    away.  It gives us an ability to pull up on top of

7    people standing on corners that might be dealing with

8    gambling, rolling dice, dealing drugs, and they don't --

9    because they have spotters.  Individuals in these

10   corners dealing drugs will have spotters that will be

11   with a whistle out or call out to them once they see a

12   marked vehicle.  This allows us to blend in better, as

13   far as with traffic, to be able to pull up on people.

14   Q.      So when you first observed the male on the

15   corner, did you pass by him?

16   A.      Originally, yes.

17   Q.      How many people would you say were on that

18   corner?

19   A.      At the time that I saw him, there might have

20   been maybe 15 people in that particular area.

21   Q.      Do you normally work that area?

22   A.      Yes.

23   Q.      Did you stop the individual right away?

24   A.      Not right away, no.

25   Q.      As you left, did you conduct a traffic stop in

1    between initially seeing him, and then coming back for

2    the second time?

3    A.      Yeah, so as we notified the other unit, via our

4    radio we were pulling down, and it might have been

5    Langham, because I think they might have been on

6    Remington, so we were going to meet up to tell them.  We

7    saw that individual, we stepped out and talked to him,

8    IDed him, ran him, nothing came back.  We kicked him

9    loose.  The other unit pulled up with us when we stopped

10   him, and explained to them as far as what I saw in the

11   situation and then we went over there together.

12   Q.      How much time would elapse give or take from

13   your first initial observation to going back the second

14   time?

15   A.      Just thinking now maybe 10 minutes.  10, 12

16   minutes, somewhere around there.  It wasn't like it was

17   a real extensive amount of time.

18   Q.      But enough time that if you were to see officers

19   come by to vacate the corner, something to that affect?

20   A.      Yes, yes, that if -- if they had either

21   recognized us as officers or if another patrol car had

22   driven by, and by absolutely means to be able to -- to

23   leave the area if they desired.

24   Q.      So when you came back the second time, the

25   marked vehicle was behind you, the individuals were

1    still on the corner?

2    A.      Yes.

3    Q.      And you stated you got out, did the group

4    disperse?

5    A.      Yes, kind of the -- the standard thing that once

6    they actually see that as police officers you are going

7    to step out of your car to address the group, then

8    everybody kind of scatters and walks away to different

9    spots, just waiting for you to leave so that way that

10   they can come back.  But they initially -- the group

11   initially started to walk away.

12   Q.      When you first saw the individual with the

13   bottle, did you recognize him?

14   A.      Initially, no.

15   Q.      When you came back the second -- excuse me, the

16   second time, you stayed, the group walked away, he

17   walked away, what did you do?

18   A.      I radioed to the marked unit behind us that the

19   individual that was walking eastbound, he would have

20   been walking right past our patrol cars because we

21   pulled up on the south side of Wilkins Street, which is

22   the sidewalk that he was walking down eastbound.  So he

23   passed our car, I radioed to the unit that's the male,

24   stop him.  And then I went to the steps that are located

25   on the side of the building there, so the south side of

1   Wilkins Street, where I saw him initially put the bottle

2   down.  That the at time I perceived it to be an open

3   container of an alcoholic beverage when I initially

4   passed him.

5   Q.      What was in the bottle?

6   A.      I believe it was Rémy Martin or a Hennessy

7   bottle, as far as -- and there was some liquor that was

8   still in it.  It was maybe about a quarter to a half

9   full.

10  Q.      Were you focused on the male or retrieving the

11  liquor bottle?

12  A.      My initial, since I knew I had the unit behind

13  me to stop him, was to retrieve the bottle in case

14  anybody else wanted to grab it to walk away with it,

15  considering that was our PC for the stop.  And to

16  determine that it actually was an open container.

17  Q.      After you secured the bottle what happened?

18  A.      I secured the bottle, I went over to the male to

19  talk to him because considering I was the one who

20  recognized him, I was the one who saw him with the

21  bottle.  You know, I was the one who secured the bottle

22  and knew what it was.  I was the one that kind of had

23  the answers to it, and I perceived it as, you know, kind

24  of my stop, as far as to engage with him, discuss with

25  him, and interview him.

1          I went to ask him questions, he just looked at

2    me, you know, he didn't want to talk to me, so he had no

3    identification.  I brought him back to my vehicle to

4    secure him, to properly ID him.

5    Q.      At that point in time, how was his demeanor?

6    A.      Not good.  It was -- it was poor, you could tell

7    he was slightly agitated.  He didn't really want to

8    answer any questions that I was asking him and not

9    cooperative.

10   Q.      Did you recognize him at that time?

11   A.      At that time, no.  Only until when I asked, I

12   believe it was Officer Leilani Colon, as far as what his

13   name was, and they gave me his name as Yahmiek Maddox.

14   I recognized the name, I still do not recognize like him

15   individually, as far as his face.  So that's when we

16   tried to go further into our investigation and make sure

17   he was who he said he was because I recognized the name

18   as an individual that I arrested coming from that same

19   area before, maybe about a month or two prior, that had

20   a significant amount of cocaine and heroin on him.

21   Q.      So as you escorted him, you took control of him

22   now --

23   A.      Yes.

24   Q.      -- at that time?  Did you escort him to your

25   car?

```
1    A.      Yes.

2    Q.      Did he walk on his own?

3    A.      Yes, he walked with me.

4    Q.      Did you place him into handcuffs?

5    A.      I believe at that time I did.

6    Q.      And any issue handcuffing him?

7    A.      Handcuffing him, no.  Again -- well, he -- at

8    that point he complied with my orders, as far as to

9    place his hands behind his back for me to put handcuffs

10   on him.  While he listened to me, still as far as his

11   body language and just the way he was talking to me,

12   kind of had me being a little cautious dealing with him

13   because he wasn't exactly being completely cooperative.

14   Q.      Almost confrontational?

15   A.      Yes.

16   Q.      At which point -- after you placed him in the

17   car, what happened?

18   A.      I started to gain his pedigree information.  I

19   believe I asked one of other officers as far as to try

20   and talk to him further to make sure we could properly

21   ID him and know he is who he says he is, because I went

22   through my own book to pull his name up and any

23   information I had on him from my prior stop to compare

24   what was given to us at that time.  So that way we could

25   ID him because at that point if we could ID him, we
```

1   could just write him the ticket, and be on our way.  If

2   we couldn't ID him, then it was either going to try and

3   attempt to gain identification from him or take him to

4   jail for the open container and no identification.

5           So other officers tried to speak to him more, as

6   far as to gain further info, which, again,

7   confrontational, not cooperative.  At one point, he just

8   stopped wanting to answer any questions.

9   Q.      Did he recognize you at all?

10  A.      I -- he may have, but he didn't say anything to

11  me as far as if he did or didn't.

12  Q.      And when you dealt with him prior, was he an

13  adult for a lack of a better term or a juvenile?

14  A.      He was a juvenile.  At the time I dealt with him

15  the first time a few months prior he was 15, and at this

16  point, I think he was 16, as far as being an adult by

17  maybe a few weeks or so.

18  Q.      So as the other officers are doing their

19  investigation on who he was, at which point in time did

20  you recognize who he was?

21  A.      I believe as I was writing the ticket one of the

22  officers might have actually started doing the actual

23  PDR for it.  And as time was progressing, the original

24  stop, as far as a few months prior came back to me and

25  that's when I told him, I said, okay, now I recognize

1    this kid now.  I remember him.  I remember his face.  He

2    is who he says he is.  He is Yahmiek Maddox.  We can't

3    take him to jail since I can ID him, so let's write him

4    the ticket and we will kick him loose and he will be on

5    his way.

6    Q.      And you felt 100 percent confident in that?

7    A.      Yes.

8    Q.      So since you could ID him, that's why you didn't

9    need a photo ID or confirmation to records to confirm

10   who he was?

11   A.      We ran him through records to obtain information

12   as far as what records had, but as far as photo ID, I

13   felt confident as far as my recollection of him.

14   Q.      So as you made that determination that you can

15   give him an appearance ticket what happened?

16   A.      We went to give him the ticket and then as I was

17   taking him out of the car, I went to try and talk to

18   him, same way we talked to Jonathan Torres, who is the

19   main drug dealer down there.  He was asking us as far as

20   what's happening to his friend and, you know, we told

21   him how Yahmiek was acting, and he's like, yeah,

22   sometimes he can be that way.

23           And I went to tell Yahmiek the same thing we

24   told Jonathan, that you need to understand that when you

25   talk this way, you act this way, and, you know, you're

1    confrontational, and have this type of attitude, it

2    doesn't make us leave.  We are supposed to be doing the

3    job out here, this is going to make us come back to this

4    corner more.

5            And that's when he responded to something to the

6    affect like I don't fucking care.  And at that point, I

7    was like whatever, I didn't see a need to further try

8    and have a conversation with the kid because his

9    demeanor and attitude the whole time was just -- was

10   terrible.

11   Q.    Up to this point had you used any profanity with

12   Mr. Maddox?

13   A.    Up to that point I don't believe I did.  After

14   the fact, though, I did.

15   Q.    And what happened as you're having that

16   conversation with him, getting ready to give him the

17   appearance ticket?

18   A.    I started to take the handcuffs off of him, and

19   as I'm taking the -- taking the handcuffs off of him, he

20   looks over his shoulder and said you're all going to

21   fucking die, something to that affect.  I stopped and I

22   looked at him and I asked him, you know, what did you

23   just say, excuse me?  And he, again, without hesitation,

24   it wasn't like he said it under his breath, he said it

25   very clearly for me to hear for a second time.  He

1    looked at me over his shoulder and said you're all going

2    to fucking die.

3    Q.    And what did you say to him at that point?

4    A.    I said, oh, now we are getting to the point

5    where we are making threats, this is what we are going

6    to do.  And he tried to backtrack, but, you know, when

7    you tell someone that they are going to die, in my

8    opinion, that's a threat.

9    Q.    Did you use profanity with Mr. Maddox at that

10   point in time, do you know?

11   A.    I believe when I was -- when I went to further

12   take his handcuffs off I did.  I told him to leave his

13   hands behind his back, and he said something to the

14   affect of like I'll do whatever I want to do.  I swore

15   at him, and then when I went and took one handcuff off,

16   telling him to keep his hand behind his back, when I

17   went to take the other off, completely disregarded any

18   order I gave him.  Brought it in front of him where I

19   had to grab it and pull it back behind him, and I swore

20   at him, again, there.

21   Q.    Was this after he stated that -- when he stated,

22   you're all going to die?

23   A.    Yes.

24   Q.    Did you take that as a threat?

25   A.    Absolutely.

1    Q.      Why use profanity at that time?

2    A.      Sometimes, as far as dealing with individuals,

3    you know, I feel like you need to kind of speak

4    sometimes the way that they are speaking to you or in

5    certain language for maybe them to understand you.  But

6    I mean, it doesn't look good, it doesn't sound good, but

7    I did use the language.

8    Q.      Was your adrenaline or your demeanor more amped

9    up at that time after the -- your interaction with him

10   as you were taking the handcuffs off?

11   A.      I would say I was more on guard and being

12   cautious with him.  I wasn't loosing my cool or getting

13   angry, but I was definitely heightened officer safety

14   and more on guard.

15   Q.      So as you take the handcuffs off, what happens?

16   A.      I take the handcuffs off of him, instructed him

17   to grab his property that was on the trunk of the car.

18   He grabs the property on the trunk of his car, and then

19   instead of walking away from me, he decides to more walk

20   and cross in front of me and as he's crossing in front

21   of me, it happens very quickly, but he yells faggot.  As

22   far as looking directly at me, but as he does so, he

23   like very quickly kind of, I don't want to say ratchet,

24   but very quickly makes a jerking motion towards me.  It

25   was subtle, it was fast, but it happened, and as soon as

1    he did that, that's when I reacted to him.

2    Q.    What do you mean reacted to him?

3    A.    I delivered a -- like an open hand to the side

4    of his face, but I maintained contact or as soon as I

5    had contact with him, I immediately transitioned into a

6    hooking technique.

7    Q.    You stated that when he came in -- let me --

8    let me back up for a minute.  As you unhandcuffed him,

9    did you stay directly behind him or create a distance?

10   A.    When I took the handcuffs off of him, I stayed

11   where I was and directed him to grab his property off

12   the trunk of the vehicle.  He went and grabbed the

13   property off the trunk of his vehicle, and I stayed

14   where I was.  I didn't like walk up or anything.  I

15   stayed where I was after I took the handcuffs off.

16   Q.    But he could have -- you opened the avenue, for

17   lack of a better term, escape for him.  You left an

18   avenue for him to leave?

19   A.    Yes, yeah, there was plenty of options for him,

20   as far as to walk away instead of the direction that he

21   did.

22   Q.    So as he comes at you, you stated that he kind

23   of made a motion to almost like come at you?  Explain

24   that a little for me.

25   A.    Yes, so given the fact that he already made his

1    threats, as far as you're all going to die, his overall

2    demeanor, as far as being confrontational, even like

3    borderline hostile, especially with his threats, when he

4    came walking in front of me, and he made kind of a quick

5    jerking motion towards me with his head and his upper

6    body, I perceived that as a physical threat.

7          As far as -- I mean, I've been in fights before

8    on the job, I've been punched before, I've been

9    assaulted before, taking these factors into

10   consideration as far as his motion towards me, I took

11   that as a physical threat, especially with the close

12   distance that we were together, and I wasn't going to

13   wait for him to punch me first.  So as soon as he made

14   that motion towards me, I immediately reacted.

15   Q.     Are you a DT instructor?

16   A.     I am not.

17   Q.     Would you say based upon your perception of

18   feeling that totality of circumstances, his -- your

19   interaction, your back and forth with him, him making --

20   saying what he did, coming forward, he was giving you

21   almost like a pre-contact queue, as he's yelling faggot

22   and kind of motioning towards you?

23   A.     Yes.

24   Q.     You read that and you put -- you stated that you

25   had a reaction to his queues, and that's when you

1    delivered a strike?

2    A.      Yes, I had a reaction to his queues, it was just

3    immediate, you know, stop the threat coming towards me.

4    Q.      Was it effective?

5    A.      Yes.

6    Q.      At that point in time he was unhandcuffed,

7    correct?

8    A.      Yes.

9    Q.      Free to go?

10   A.      Yes.

11   Q.      After you struck him with your right hand and

12   went into a hooking technique, what happened?

13   A.      I pulled him towards me, as far as saying like

14   put your hands behind your back, I pulled him towards

15   me, we spun around and went towards the car.  At that

16   point, he ended up being pulled away from me, and as he

17   was pulled away from me, he threw two punches, striking

18   me in the face, which ended up breaking my glasses and

19   cutting me up on the side of my face.

20   Q.      You're indicating the right side of your face?

21   A.      Yes, I actually have two small scars right here

22   from that.

23   Q.      Did you receive medical treatment?

24   A.      I don't believe I went to Highland Hospital or

25   anything like that at that point.  I just got it cleaned

1  up.

2  Q.      So what happened then?

3  A.      He went to the ground.  He was given orders to

4  put his hands behind his back, which he didn't.  I

5  believe I delivered two or three straight punches to his

6  lower side torso area.  After those, he placed his hands

7  behind his back and he was handcuffed.

8  Q.      You delivered the strikes to his torso area?

9  A.      Yes.

10  Q.      Why?

11  A.      After -- well, he already threw two punches

12  contacting me in my face, and I knew I was -- had some

13  type of laceration because I could feel the burning on

14  the side of my face.  He was on the ground, still not

15  cooperative, still not placing his hands behind his

16  back.  And from the time he threw the punches, to the

17  time he was on the ground was seconds.

18  Q.      So the punches you delivered were to do what?

19  What was your intended reaction you wanted?

20  A.      For him to listen to our orders, to place his

21  hands behind his back and stop resisting.

22  Q.      Were the punches effective?

23  A.      He -- right after that, he placed his hands

24  behind his back, so I would say yes.

25  Q.      So they were, would you say pain compliance or

1    distractionary technique?

2    A.      Pain compliance.

3    Q.      So after you delivered the strikes, what

4    happened?

5    A.      He was placed in handcuffs, picked up, brought

6    over to the patrol car.  As we were putting him in the

7    patrol car, he spit directly in my face, at which I

8    issued a burst of OC spray.  He was put inside the

9    vehicle.

10          As I got into the driver's seat of the vehicle,

11   he then spit through the cage the second time onto the

12   side of my neck and face, so I got out and delivered

13   another burst of OC, giving him orders to stop spitting.

14   Q.      Was that effective?

15   A.      Not really.  The OC spray, while my target was

16   for his face, I don't believe I actually hit him because

17   he kept turning his head.  So I might have hit like his

18   shoulder and the back of his neck, but he didn't spit,

19   again, after that point.

20   Q.      Did you apply a spit sock at that time?

21   A.      No, at that time we decided to relocate because

22   there was a large crowed that was starting to surround

23   us, and surround our vehicle to where we had to call in

24   other officers to come assist us.  So to not stay in

25   that area and kind of just remove ourselves and remove

```
 1    him to help relieve the hostility of the crowed, we

 2    relocated back to the Clinton section office and met our

 3    supervisors there.

 4    Q.      And then what happened once you got there?

 5    A.      Sergeant Gonzalez and Lieutenant Diehl

 6    responded, and I believe Sergeant Gonzalez might have

 7    put a spit sock on him.

 8    Q.      Did you utilize any other force on him?

 9    A.      No.

10    Q.      What did you end up charging Mr. Maddox with?

11    A.      I believe it was harassment -- actually, I don't

12    recall right off the top of my head.  I know we had

13    harassment, open container, and resisting arrest.

14    Q.      What was the harassment second for?

15    A.      I took the harassment second for, as far as for

16    his initial jerk response towards me, as far as what I

17    perceived as a threat, as well as him punching me in the

18    face.

19    Q.      So the initial -- his initial action, which

20    caused your quick reaction to the -- the slap and the

21    hook, that was the initial harassment second?

22    A.      That's what I perceived it as, yes.

23    Q.      And then the resisting arrest was him --

24    A.      Him fighting us and then harassing, as well for

25    punching me in the face.
```

1   Q.      When you prior dealt with Mr. Maddox, did he

2   resist his arrest then?

3   A.      Well, he -- nothing to the point where I thought

4   resisted arrest, but, again, completely uncooperative.

5   I believe there was a time when we were trying to search

6   him, and he kept pulling away from us, trying to like

7   squat and sit down, preventing us from conducting our

8   actual search.  To where it took a number of officers to

9   kind of try and keep him still just to hold him because

10  he kept on trying to like flock to the ground.  But --

11  and that was right after -- that was when we were

12  getting close to the area where he was hiding the drugs.

13  Any time we got close to the waistband area where he had

14  the drugs hidden, that's when he would start to react.

15  But once they were found, then he stopped his antics.

16  Q.      After Mr. Maddox called you a faggot, did you

17  strike him because he called you that name?

18  A.      No.

19  Q.      During this time were the other officers

20  occupied as you were -- had Mr. Maddox in the car?

21  A.      I'm sorry, at which time?

22  Q.      Like you had two or three other officers there,

23  was each other officer completing a task, that you know

24  of?

25  A.      For which task?

1    Q.      In relation to this arrest.  During -- after you

2    had placed Mr. Maddox in the car --

3    A.      After the second time, after the actual incident

4    itself or the first time?

5    Q.      After the first time, when you initially placed

6    him into cuffs and were going to give him an appearance

7    ticket, were the other officers occupied at that time?

8    A.      Yes, I believe Officer Colon and Lucero were at

9    their car.  I believe they were the ones doing the PDR

10   before I told them that I could ID him.  And Officer

11   Eisenhauer, I don't know if he was doing the property --

12   he might have been doing a piece of paperwork, but then

13   also discussing some things with some of the individuals

14   that kept on coming up, as far as asking what was

15   happening with Yahmiek.

16           **SERGEANT DREW:**  Sergeant Tordai?

17   **BY SERGEANT TORDAI:**

18   Q.      Officer Perelli, when Mr. Maddox put the bottle

19   down, were there any other bottles on the step?

20   A.      On the step, no.  There was one other bottle

21   next to the step, but the only bottle sitting on the

22   step that resembled the one that I saw him holding in

23   his hand was the one that I grabbed.

24   Q.      In your explanation that -- to explain why you

25   used profanity towards Mr. Maddox, would you call it,

1    your response, a verbal escalation on your part, so

2    basically just making sure that Mr. Maddox understood

3    that you were serious because some times people, when

4    you address them nicely, they think they can get one

5    over on you?

6    A.    Yes.

7    Q.    From your DT, do you recall what the distance

8    for your reactionary gap is?

9    A.    I don't -- I don't --

10   Q.    Maybe four to six feet?

11   A.    Yes.

12   Q.    When Mr. Maddox approached you and called you a

13   faggot and basically had that aggressive stance, was he

14   within that gap?

15   A.    Yes.

16   Q.    Do you recall if anybody told him that he was

17   under arrest after he started to hit you?

18   A.    When I had him in the hooking technique, I

19   believe I gave an order as far as place your hands

20   behind your back.

21   Q.    Absent that an individual should know that once

22   they hit a cop, that perhaps they are going to be going

23   to jail, correct?

24   A.    Yes.

25   Q.    Okay.  Physical description of Mr. Maddox?

1    A.      I believe he's around probably 5'8, maybe around

2    150, 160ish.   I mean, weight-wise he's probably mine,

3    but he's also taller than me.

4    Q.      So his reach is kind of longer than yours?

5    A.      Yes, he has a larger reach than I do.

6          **SERGEANT TORDAI:**  Okay.  I'm all set.

7    **BY SERGEANT DREW:**

8    Q.      Officer Perelli, was Mr. Maddox injured?

9    A.      No, he had no physical injuries as far as from

10   our incident that we could see or that he complained of.

11   Q.      And did he receive treatment for the OC?

12   A.      Yes.

13   Q.      And what treatment did he receive?

14   A.      We took him to the PSB eyewash.

15   Q.      And did he receive treatment or did he refuse it

16   at that point in time?

17   A.      He received it.  I believe he received it or

18   maybe not.  We brought him there because he was

19   complaining about the burning on his back and the back

20   of his neck, but once we got him there, then he started

21   saying he didn't want to go and we had to call Sergeant

22   Gonzalez to come down to witness the refusal.

23         **SERGEANT DREW:**  Nothing further.  Investigator

24   Gould?

25   **BY INVESTIGATOR GOULD:**

1    Q.      Did -- when you did this, the SRR, besides the

2    body worn camera footage, was there any other

3    surveillance video obtained?

4    A.      There was footage from the corner store of

5    Joseph and Wilkins.

6    Q.      Did you have an opportunity to view that video?

7    A.      Yes.

8    Q.      Okay.  When you viewed it, did you view it in

9    realtime?

10   A.      Both in realtime and in slow motion.

11   Q.      Does that video fairly and accurately portray

12   what happened there?

13   A.      Yes, it can be clearly seen more in the slow

14   motion version of the video.

15           **INVESTIGATOR GOULD:**  I'm all set.

16           **SERGEANT DREW:**  Officer Perelli, prior to

17   concluding your statement, is there anything you wish to

18   add to the record?

19           **OFFICER PERELLI:**  No.

20           **SERGEANT DREW:**  Okay.  Ending your statement at

21   10:40.

22

23

24

25

```
 1            C E R T I F I C A T I O N

 2

 3    I, Emily A. Sallome, hereby certify that I reported in

 4    stenotype shorthand, the statement of Officer Phillip

 5    Perelli in the above-entitled matter on July 20, 2018

 6    and that the foregoing transcript, numbered pages 2

 7    through 25, was typed by computer-aided transcription

 8    and constitutes a true, accurate and complete record of

 9    those stenographic notes.

10

11

12                  _____

13                  Emily A. Sallome

14                  Police Stenographer

15

16

17

18    Dated this 26th day of July, 2018

19

20

21

22

23

24

25
```